841 P.2d 550

Marie Louise QUARLES, a single woman, Plaintiff–Appellee,

v.

(1) Pursima ARCEGA, Rogelio Arcega a/k/a R.V. Arcega, Donald A. Armstrong, W. Brawley, Jose Carbelleira, Natividad Q. Chavez, Roger Covel, Robert Creason, John Howard, Daniel Lovato, Thomas K. Marshall, Antonio A. Martinez, Eluterio Martinez, Jr., Eluterio Martinez, Sr., Espiridon Martinez, Matilde D. Martinez, William D. McMillin, Estella M. Montano a/k/a Stella M. Montano, W.H. Mundy, Jr. a/k/a Bill Mundy, Jr., Natalia Quintana, Theodore Sanders a/k/a T.E. Sanders, Lloyd F. Satterlee, Lynn Lee Svoboda, Edward Vigil, Jr., Earl Woods;

(2) Arlington Land Company, a defunct corporation; Patco;

(3) The Following named Defendants by Name, if Living: If Deceased, their Unknown Heirs: Teodora M. Hallock a/k/a Theodora M. Hallock, Antonio Salazar de Lopez, Maria M. Rivera;

(4) The Unknown Heirs of the Following Named Deceased Persons: Ester M. Chavez, Miguel Chavez, Ruben Chavez, Juana de Herrera, Jose G. Lobato, Preciliano Lopez, Rufina Lopez, Maria Rufina Lopez de Salazar, Narciso Martinez, Porfiria Martinez, Simon Martinez, Ana Maria Valdez Montoya, Jose Bivian Montoya, Manuel Savino Salazar, Manuel Serrano, Maria de la Luz Salazar Serrano, Antonio Ma Suaso, Jose Vivian Suazo, Tomas A. Trujillo a/k/a Thomas A. Trujillo;

and

(5) All Unknown Claimants of Interest in the Premises Adverse to Plaintiffs [sic], Defendants,

and

Theis Land Company, a general partnership, Defendant–Appellant.

Natividad CHAVEZ a/k/a Mrs. Frank Chavez, a married woman dealing in her sole and separate property, Plaintiff–Appellee,

v.

GROUP ONE: CHAMA VALLEY LAND COMPANY, a defunct New Mexico Corporation; Marie Louise Quarles; Angie Romero Sanchez; Elena Sanchez; Benjamin Valdez; Isabel G. Valdez;

GROUP TWO: The Unknown Heirs of the Following Named Deceased Persons: John H. Burns; Charles C. Catron; Julia A. Catron; T.B. Catron a/k/a Thomas B. Catron; Francisco Martinez; Manuel Martinez; Gregorita Sanchez de Pino; Jose Pino; Bernardo G. Sanchez; Edelmiria Garcia de Sanchez a/k/a Edelmiria G. de Sanchez; Irene Sanchez; Matias Sanchez, Jr.; Matias Sanchez, Sr.; Necomedes Sanchez; Roque Sanchez; Sarah Seth; Theodore Seth;

GROUP THREE: The Following Persons by Name, if Living, if Deceased, Their Unknown Heirs: Nicoles Abeyta; Guadalupe S. de Archuleta; Rayos Archuleta; Cleotilde S. de Salazar; Jose Ramon Salazar; Ascension B. de Sanchez a/k/a Asencion V. de Sanchez; Eturbide Sanchez;

and

GROUP FOUR: And all Unknown Claimants of Interest in the Premises Adverse to the Plaintiffs, Defendants,

and

Theis Company, a general partnership, Defendant–Appellant.

No. 12067.

Court of Appeals of New Mexico.

Sept. 2, 1992.

Certiorari Denied Oct. 27, 1992.

John F. McCarthy, Jr., Sumner S. Koch, Ann M. Harvey, White, Koch, Kelly & McCarthy, P.A., Santa Fe, for plaintiff-appellee Marie Louise Quarles.

James H. Russell, Jr., Santa Fe, for plaintiff-appellee Natividad Chavez.

C. Mott Woolley, Santa Fe, Michael W. Brennan, Carpenter, Crout & Olmsted, Santa Fe, for defendant-appellant Theis Co.

## OPINION

MINZNER, Judge.

Defendant Theis Company appeals the trial court's decision after a bench trial quieting title in favor of Plaintiffs Quarles and Chavez, contending that (1) the trial court erred in locating a boundary line; (2) the trial court erred in admitting into evidence surveys offered by Plaintiffs; (3) Plaintiffs failed to establish adverse possession by clear and convincing evidence; and (4) Plaintiffs failed to establish paramount title. For the reasons stated below, we affirm.

## I. BACKGROUND

The trial court consolidated two complaints filed in 1985 that sought to quiet title to three separate tracts of land located in the Tierra Amarilla Land Grant near the village of Los Brazos: the Quarles Farm (710 acres), the Barranca Tract (105.997 acres, more or less), and the Brazos Tract (133.733 acres, more or less). The Quarles Farm and the Barranca and Brazos Tracts border property owned by Theis Company. The appeal involves competing claims to approximately sixty-three acres. Plaintiffs claim the area described by their deeds includes areas west of the Chama River; Theis Company claims their common boundary is the river.

The sixty-three acres in dispute lie between the river and a fence (the Sargent–Theis fence) constructed by Edward Sargent, Theis Company's predecessor in title, in the late 1930s or early 1940s. This fence runs north and south, marks the eastern boundary of a 55,000-acre ranch that Theis

Company purchased from Sargent in the early 1950s, and divides the ranch from a smaller parcel consisting of 220 acres Theis Company purchased from Sargent in 1955. The 1955 deed described the eastern boundary of the 220–acre parcel as the west bank of the Chama River.

The record indicates that Quarles's father acquired the Quarles Farm in the course of three separate conveyances in 1912, 1917, and 1919. The 1912 deed, from Quarles's grandfather and grandmother to her father, conveyed three parcels, the southern boundary of which is described either as the " 'hill on the other side of the river' or the 'top of the hill on the other side of the river.' " The 1917 deed describes the west boundary of the property as the " 'top of the hill across the Chama River.' " The 1919 deed describes the west boundary as the " 'hill on the other side of the Rio Chama.' " The 1948 deed incorporates these three deeds by reference. The trial court found that the three conveyances to Quarles's father provide Quarles's color of title.

Quarles testified that she always considered the Sargent–Theis fence her western boundary, and, as far as she knew, the fence had always been in the same location. She stated that she never asked Theis Company's permission to use the disputed tract, and recalled having one discussion with Locke Theis (Mr. Theis), a general partner of Theis Company, about the disputed area. Mr. Theis told her that the company's land actually came down to the river, and she objected, stating that "we have always had that fence [to mark the boundary]." After that conversation, Quarles continued to use the area as grazing land. Quarles also stated that she meant only to claim the land described in her deeds, and nothing beyond that. According to unchallenged findings, Quarles proved payment of taxes for over twenty years on the land she claims west of the Chama River.

Chavez claims 16.7 acres on the west side of the Chama River as part of the Barranca Tract. Chavez also claims 32.7 acres on the west side of the Chama River as part of the Brazos Tract. The southern boundary of the Quarles Farm is contiguous with the northern boundary of the Barranca Tract. The Brazos Tract is south of the Quarles Farm and the Barranca Tract, but is not adjacent to the Barranca Tract. Quarles claims that the Quarles Farm includes about fourteen acres on the west side of the Chama River.

Plaintiff Chavez based her claim to record title to the Barranca Tract in part on various deeds from two uncles and from their heirs, her uncles having acquired the tract as a result of two conveyances in 1924. Both 1924 deeds, from Edelmira G. de Sanchez, widow of Necomedes Sanchez, Chavez's grandfather, describe the west boundary of the property as " 'the foot of the hill,' 'the hill' or other limit on the west side of the river as set forth in the deeds given by Francisco Martinez and conveying this land." Chavez traces Necomedes' record title to a conveyance from John H. Burns in 1909, which described the western boundary as " 'the foot of the hill or ridge on the other side of the Chama River.' " She traced Burns's title to a conveyance in 1902, which according to an unchallenged finding described the west boundary of the tract as " 'the top of the hill or ridge on the other side of the River.' " In a finding challenged by Theis Company, the trial court found that the 1909 deed conveyed the same property conveyed by the 1902 deed. The trial court found that the deeds to Burns in 1902 and Chavez's grandfather in 1909 provide Chavez color of title to the Barranca Tract.

Chavez traced her record title to the strips of land that make up the Brazos Tract, in part, to deeds from family members, who acquired their interest by intestate succession, at least in part, from Chavez's grandparents, Necomedes Sanchez and Edelmiria G. de Sanchez. Chavez's grandparents acquired their interests as a result of three separate deeds, one in 1903 and two in 1922. These deeds describe the western boundary as "the hills," "the hills on the other side of the Chama River," and "the top of the slope on the other side of the river." The trial court found that the deeds to Chavez's grandparents provided her color of title to the Brazos Tract.

Chavez's testimony concerning the area in dispute was similar to that of Quarles. She stated that she had always recognized the Sargent–Theis fence as her western boundary and that the community custom has been for all the property owners along the east side of the Chama to consider the Sargent–Theis fence as their western boundary. Chavez testified that she occasionally pastured sheep and cattle in the disputed area. She never asked Theis Company if she could use the disputed area, nor did Theis Company ever give her permission to do so. Chavez also stated that she was not claiming any land beyond her deed description. According to unchallenged findings, she proved payment of taxes for over ten years on the land she claims west of the Chama River.

Various neighbors also testified and confirmed that it was commonly understood that the Sargent–Theis fence was the western border of the properties in question. One witness stated that the disputed area was used by everyone, and he considered it to belong to everyone, because that was community custom.

Mr. Theis testified that the Sargent–Theis fence was not a boundary fence, but an internal cross fence. Mr. Theis testified that it was not economically feasible to build a fence on the river's bank because it would wash out each spring. He stated that there were fences running east to west on the east side of the fence through the disputed area. Mr. Theis acknowledged that he was aware that Quarles's cattle were in the disputed area, but he had assumed that the cattle wandered in accidentally, and he told his employees to run them off. He further testified that he made no use of the land in question.

Theis Company's ranch foreman, George Shouse, testified that in his thirty years on the ranch, he saw cattle between the fence and the river around five or six times a year, and on each occasion, he would push them back across the river. He said that he never grazed cattle in the disputed area because he did not need the property to maintain the cattle he had, and he did not want to take a chance on the cattle wandering across the river.

The trial court wrote a decision letter following trial, indicating that Plaintiffs had shown the requisite elements of adverse possession by clear and convincing evidence, that all parties had recognized the Sargent–Theis fence as their mutual boundary, and that Plaintiffs held paramount record title. The letter also states that the "foot of the hill" on the west side of the Chama River is contiguous with the Sargent–Theis fence and that neither common use of the land by Plaintiffs and their neighbors nor Plaintiffs' failure to repair fences running east-west between the river and the Sargent–Theis fence precluded their claim based on adverse possession.

The trial court also entered separate findings of fact and conclusions of law for each Plaintiff. The findings and conclusions made regarding Chavez's claims distinguish the Barranca and Brazos Tracts.

In addition to the findings made in the decision letter, which were incorporated by reference, the trial court found that the Sargent–Theis fence was the western boundary of each of the three contested tracts and that the top of the ridge or hill on the west side of the Chama is to the west of the fence. The trial court also found that the ridge on which the fence is located is the same ridge described in various deeds, including those that support Chavez's claim to color of title and those offered by Quarles in support of her grandfather's record title, and that the river described in the Quarles deeds is the Chama River. The trial court also held that Plaintiffs' surveys were properly prepared and based on deeds containing descriptions that could be located on the ground.

The trial court concluded that Quarles's title to the Quarles Farm is directly traceable to her parents, who were in possession of the farm for over twenty-nine years. The trial court also concluded that she and her predecessors in interest "have been in actual, visible, notorious, hostile, exclusive and complete possession in good faith of

**508**

the QUARLES FARM under color of title for a continuous period in excess of sixty-six (66) years" and have made "regular and timely payments on the taxes" for the same period. The trial court quieted title in Quarles.

The trial court concluded that Chavez's titles to the Barranca and Brazos Tracts are directly traceable to her grandfather and uncles, who were in continuous possession of those tracts for a period in excess of eighty years. The trial court also concluded that she and her predecessors in interest "have been in actual, visible, notorious, hostile, exclusive and complete possession in good faith of the BARRANCA TRACT and the BRAZOS TRACT under color of title for a continuous period in excess of eighty (80) years" and have made "regular and timely payments on the taxes" for the same period. The trial court quieted title against Theis Company and in Chavez subject only to the rights of persons not parties to the present lawsuit.

## II. DISCUSSION

On appeal, Theis Company argues that the trial court's findings and conclusions contain a number of specific errors. For example, Theis Company specifically attacks the trial court's findings regarding the deeds supplying the western boundary of the Barranca Tract. Theis Company argues that these deeds describe land only on the east side of the river and, because it is undisputed that the Quarles Farm and the Barranca Tract share a common boundary, Quarles's claim to land on the west side of the river must fail as well. Theis Company also argues that the trial court erred in relying on the surveys because the surveyors erred in surveying to the fence; that the trial court reformed a key Quarles deed, although reformation was not pleaded, because the trial court accepted the 1912 deed's reference to the southern boundary as a mistaken reference to a western boundary; and that the trial court applied the doctrine of acquiescence when it was not properly in issue.

Plaintiffs argue that Theis Company's challenges to the sufficiency of the evidence should be rejected because it failed to summarize the relevant evidence, with appropriate transcript references, as required by SCRA 1986, 12–213(A)(3) (Cum. Supp.1991). We believe Theis Company has provided a sufficient summary and related references to the transcript for us to review their specific contentions that Plaintiffs failed to prove title by adverse possession. We address only those contentions because the trial court's determination that Plaintiffs "have paramount record title to the disputed lands by virtue of their deeds" appears only in the decision letter. "The rules of civil procedure for the district courts are clear that the trial court's formal findings represent the court's official decision." *Western Bank v. Fluid Assets Dev. Corp.*, 111 N.M. 458, 460, 806 P.2d 1048, 1050 (1991) (citing SCRA 1986, 1–052(B)(1)(g)).

We recognize that the trial court specifically incorporated into its findings and conclusions the findings and conclusions contained in the decision letter. However, the trial court's official decision appears to hold in favor of Plaintiffs on the basis of adverse possession. To establish title by adverse possession within a land grant, a party must prove actual, visible, exclusive, hostile, and continuous possession of the disputed property, under color of title, for a ten-year period. *See* NMSA 1978, § 37–1–21 (Repl.Pamp.1990); *Esquibel v. Hallmark*, 92 N.M. 254, 256, 586 P.2d 1083, 1085 (1978); *Hernandez v. Cabrera*, 107 N.M. 435, 759 P.2d 1017 (Ct. App.1988). The statute, which originally had no tax payment requirement, was modified to include such a requirement in 1979. *See* 1979 N.M.Laws, ch. 354, § 1. The conclusions made for each tract correspond to these elements. Further, judgment cannot be sustained unless the conclusion upon which it rests finds support in one or more findings of fact. *Thompson v. H.B. Zachry Co.*, 75 N.M. 715, 410 P.2d 740 (1966). There are insufficient findings in this case to support a determination that both Plaintiffs proved record title. We conclude that the trial court ruled in favor of Plaintiffs

on the basis of their having proved title on the basis of adverse possession.

 Theis Company specifically contends that the trial court erred in determining that Plaintiffs proved ownership by adverse possession because (1) Plaintiffs lacked the requisite intent; (2) their deeds do not describe all of the land they claim, and therefore Plaintiffs failed to establish color of title to the disputed area; and (3) Plaintiffs' use of the area was insufficient to establish actual, open, exclusive possession. We address each of these arguments. We have, however, reviewed all of the findings the trial court made, rather than only the findings challenged on appeal by Theis Company. We have done so because our task on appeal requires us to construe findings to uphold a judgment rather than to reverse it. *See Roybal v. Morris*, 100 N.M. 305, 311, 669 P.2d 1100, 1106 (Ct.App.1983). If from the facts found, the other necessary facts to support the judgment may be reasonably inferred, the trial court's judgment may be affirmed. *See Newcum v. Lawson*, 101 N.M. 448, 455, 684 P.2d 534, 541 (Ct.App.1984). "Even if a finding of fact or conclusion is erroneous, if it is unnecessary to the court's decision, the mistake is not a basis for reversal." *Id.*

### A. Mistake

Theis Company contends that Plaintiffs' statements that they only intended to claim what was in their deeds established that Plaintiffs lacked the necessary hostile intent to establish a claim for adverse possession because their claims arose due to a mistaken belief about their western boundaries. *See Ward v. Rodriguez*, 43 N.M. 191, 196–97, 88 P.2d 277, 281 (one who claims property belonging to another, under the mistaken belief that his boundary line encompasses the property, does not claim adversely, because he merely intends to claim what is truly his), *cert. denied*, 307 U.S. 627, 59 S.Ct. 837, 83 L.Ed. 1511 (1939); *see generally* Verle R. Seed, *Adverse Possession in New Mexico—Part Two*, 5 Nat. Resources J. 96, 114 (1965) (discussing *Ward*, which seems to take into account

mental attitude of alleged adverse possession, contrary to majority view, and seems to be "at odds with that taken with reference to the meaning of good faith in connection with color of title"). We interpret this argument as having two parts: (1) Plaintiffs conceded their lack of hostility; and (2) Plaintiffs were mistaken about the extent of the property described by their deeds.

 Although both Quarles and Chavez stated that they only meant to claim to the extent their deeds entitled them, they also testified that they had always considered the disputed area their property. There was no evidence that Plaintiffs discontinued their use, even after Mr. Theis told Quarles his property included the disputed area. Theis Company presented no evidence, beyond Plaintiffs' statements on cross-examination, that Quarles's and Chavez's possession was based solely on the mistake, and, but for the mistake, they had no intent to occupy the land. These statements do not support reversal.

We agree with the analysis found in *Hicks v. Flanagan*, 30 Ark.App. 53, 782 S.W.2d 587 (1990), in which the court cautioned against giving too much weight to statements, identical to those made by Plaintiffs in this case, in which the claimant denied that he was claiming anything beyond his entitlement. The court noted that:

> [A]n honest claimant, unless previously warned, might not think to qualify his answers so as to claim what he considered to be his own, but would state that he claimed only his own, at which point his claim would disappear. In arriving at the intent of a disseisor, [it is] "better to weigh the reasonable import of his conduct in the years preceding the litigation rather than rely on one remark made during the stress of cross-examination."

*Id.*, 782 S.W.2d at 589–90 (quoting *Rye v. Baumann*, 231 Ark. 278, 329 S.W.2d 161, 164 (1959)).

*Ward* is also distinguishable because its facts indicate that the claimants never intended to claim beyond their true boundary. One of them attempted to erect a

fence on the true line and was not attempting to appropriate his neighbors' land; in fact, he maintained all along that the fence *was* the true line. The court then stated that there was no proof that the titleholders ever understood that claimants claimed beyond the true line. *Ward*, 43 N.M. at 197, 88 P.2d at 281. Thus, the claim of adverse possession failed for lack of the necessary intent.

The Arkansas Court of Appeals distinguished the situation in which a person "takes possession of the land of another intending to claim only to the true boundary" and that in which "acting on a mistake as to the true boundary, he takes possession of the land of another *believing it to be his own.*" *Hicks*, 782 S.W.2d at 590 (emphasis in original). In the first situation, the possession is not adverse; in the second, "the intent to retain possession under an honest belief of ownership is adverse possession." *Id.*

We believe that *Ward* is an illustration of the first situation; the present case is an illustration of the second, if Plaintiffs were mistaken about the true boundary. We also believe that both situations present factual issues for the trial court to resolve. We note in *Ward* that the appellate court affirmed the trial court's decision in favor of the titleholder.

In addition, we note that Plaintiffs are entitled to rely on the possession of their predecessors in title. *See Romero v. Herrera*, 27 N.M. 559, 564, 203 P. 243, 244 (1921). The trial court concluded that Plaintiffs' predecessors had been in possession under a claim of right made in good faith. Theis Company does not appear to challenge that determination.

For these reasons, we hold that *Ward* neither controls this case nor disposes of Plaintiffs' claims. We next address Theis Company's contention that Plaintiffs failed to prove color of title.

### B. Color of Title

The relevant statute provides that the claimant must hold or claim "by virtue of a deed or deeds or [of] conveyance, ... purporting to convey an estate in fee simple." § 37–1–21. Under that statute and our cases, "color" of title means "apparent," not "actual" title. It is an element of a claim to non-record title. Only a few states impose such a requirement; it was not a requirement at common law. *See* III *American Law of Property* § 15.4(c), at 785 (1952). Color of title "affords good evidence of the hostility of the possession of the grantee and may lessen the notoriety and frequency of his acts of ownership from what would otherwise be required to show title in him by adverse possession." *Id.* Thus, it serves two purposes. We recognized the first purpose in *Hernandez* when we held, under a related statute, that to establish adverse possession one must prove "a good faith claim of right under color of title." *Id.*, 107 N.M. at 436, 759 P.2d at 1018.

The statute itself only requires a deed that purports to convey a fee. *See* § 37–1–21. There is no doubt that both Plaintiffs have satisfied that requirement. In New Mexico, as a matter of case law, we have also required that there be a sufficient description to identify the property. *Brylinski v. Cooper*, 95 N.M. 580, 624 P.2d 522 (1981). "But where the description in the deed, aided by extrinsic evidence, is insufficient to identify the property, the deed cannot serve as color of title." *Id.* at 583, 624 P.2d at 525.

Theis Company argues that the "principal office of color of title is to define boundaries." *Green v. Trumbull*, 37 N.M. 604, 605, 26 P.2d 1079, 1080 (1933). However, as *Hernandez* indicates, color of title also serves the purpose of establishing the requisite intent. Further, while the definition of boundaries might be necessary to identify the property claimed, a claimant may extend his or her claim of adverse possession by showing color of title to an area greater than the area actually possessed. *See Marquez v. Padilla*, 77 N.M. 620, 623, 426 P.2d 593, 595 (1967). Thus, if a claimant established actual possession of a portion of property under color of title to a larger parcel, he or she was treated at common law as being in constructive pos-

session of all of the property described by deed. *Marquez* seems to be an example of that common law principle. We address the application of that principle under Theis Company's argument that Plaintiffs failed to prove the element of actual possession. In this case, however, we conclude the same evidence suffices to satisfy the requirement of color of title whether the issue is intent, identity, or scope of actual possession.

 The rule in New Mexico is that a party's color of title must be supported by a writing or conveyance of some kind that purports to convey the land that is in dispute. *Currier v. Gonzales*, 78 N.M. 541, 434 P.2d 66 (1967). However, the strict requirements for the validity of a deed have no application to the color of title requirement for adverse possession. *Williams v. Howell*, 108 N.M. 225, 770 P.2d 870 (1989). Extrinsic evidence may be offered to aid the description of an ambiguous deed for purposes of the color of title requirement, and the evidence need not be referred to in the deed itself. *Brylinski v. Cooper*. In *Brylinski*, the question was "what kinds of extrinsic evidence are admissible to cure the inadequacies of a deed description for the purposes of the color of title requirement." *Id.*, 95 N.M. at 583, 624 P.2d at 525. This case is analogous. The heart of Theis Company's appellate challenge is that the trial court improperly relied on the fence. We address that question first.

Theis Company contends that the trial court erroneously applied the doctrine of acquiescence because it relied on the fence. Plaintiffs contend that the trial court did not make any finding based on acquiescence, and thus the issue is not before us. We agree with Theis Company that the trial court relied on the fence; we do not think the trial court's reliance was improper.

 In this case, the long-standing existence of the fence and its reputation in the community was evidence regarding the portion of the hill to which Plaintiffs' deeds refer. *Compare Woodburn v. Grimes*, 58 N.M. 717, 275 P.2d 850 (1954) (evidence of

plaintiffs' silent acquiescence in defendant's and his predecessors' occupation of the premises he claimed up to the old fence line was sufficient to show that the old fence was built on the true boundary line) *with Sanchez v. Scott*, 85 N.M. 695, 516 P.2d 666 (1973) (where there is doubt or uncertainty regarding the true location of a boundary line, the parties may by oral agreement fix a line that will, when followed by possession with reference to the boundary, be conclusive on them and their grantees). Our cases say that a fence may be evidence of the true boundary. *See Woodburn v. Grimes*. It is only logical that it may also provide evidence of the boundary for purposes of the color of title requirement. Our cases also say that the extrinsic evidence used to construe an ambiguous deed for purposes of color of title need not be referred to in the deed itself. *See Williams v. Howell*, 108 N.M. at 227, 770 P.2d at 872. For these reasons, we see neither inconsistency nor impropriety in recognizing the fence as relevant evidence for purposes of construing Plaintiffs' deeds in the context of their claim based on adverse possession. We now turn to the particular deeds that the trial court found provided color of title.

 We note that Theis Company has not specifically challenged Chavez's proof of color of title to the Brazos Tract. Further, in an unchallenged finding, the trial court found that the deeds to the Brazos Tract acquired by Chavez's predecessors in interest described its western boundary as "the hill," "the hills," and "the top of the slope," and that these terms all refer to the same ridge west of the Chama River. Quarles's surveyor testified on direct examination that the fence was located approximately on top of the hill to the west. Under these circumstances, we think that the trial court was entitled to conclude that Chavez had proved deeds that provided a sufficient description to satisfy the color of title requirement.

Theis Company concedes that the southern boundary of the Quarles Farm is coextensive with the northern boundary of the Barranca Tract. The 1909 deed to Cha-

**512**

vez's grandfather refers to the "foot of the hill," while the 1902 deed to his predecessor in interest refers to the "top of the hill." Although Theis Company challenges the trial court's finding that the 1909 deed conveyed the same property as the 1902 deed, the record certainly supports the contention that it purported to do so. The 1909 deed refers to the 1902 deed by book and page number. Thus, the deeds on which the trial court based its determination that Chavez proved color of title to the Barranca Tract contain conflicting descriptions. The trial court found that "[b]ased upon the lay of the land, ... 'the foot of the hill on the west side of the Chama River' is contiguous with the Sargent–Theis fence." Theis Company argues that every witness who addressed the issue testified to the contrary. We understand Theis Company to contend (1) that the hill is steep, and (2) that the fence was not at the foot of the hill. Theis Company specifically contends that the fence lies beyond the top of the hill. We believe that the challenged finding was a finding regarding the meaning of the phrase "the foot of the hill," which appears in the 1909 deed to Chavez's grandfather, as well as in deeds from his widow to two of his sons, rather than a finding about the physical location of the fence. Thus, we construe it as a finding interpreting or construing one of the deeds to the Barranca Tract, because that is consistent with the trial court's findings concerning the Brazos Tract and because by so construing the finding we uphold the judgment.

We specifically construe the trial court's finding that the "foot of the hill" is contiguous with the fence as encompassing an implicit finding that the references in the two deeds are to the same point, as well as an explicit finding that the fence marks that point. That is consistent with the trial court's unchallenged finding regarding the Brazos Tract. It is also consistent with the more general finding that the ridge on which the fence is located is the same ridge described in various deeds offered by Chavez. We believe the evidence supports the findings.

Because the descriptions in the two deeds to the Brazos Tract were conflicting, the trial court was entitled to consider extrinsic evidence in construing them. Adverse possession is a doctrine that serves a useful function in clarifying title where deeds are deficient; deficient descriptions are not sufficient to defeat a claim based on adverse possession. *See Williams v. Howell.* We believe that *Williams* permits the use of extrinsic evidence to resolve such conflicts.

In this case, there was evidence that Plaintiffs and others in the community viewed the fence as a boundary line. *See* SCRA 1986, 11–803(T) (reputation concerning boundaries or general history). Moreover, Quarles's surveyor said that the line on which the fence was erected had historically been used as the boundary line in deeds dating from the early 1900s. There was also evidence that the fence was used as the western boundary for the parcels that lay primarily on the east side of the river. Mr. Theis himself testified to the existence of east-west fences that ran to the Sargent–Theis fence. Based on this evidence, we believe that the trial court was entitled to find that the fence marked the portion of the hill to which the deeds referred. *See generally Padilla v. City of Santa Fe,* 107 N.M. 107, 753 P.2d 353 (Ct.App.1988) (under rules of construction, deed's call "to the hills" as boundary controlled over call to distance, and middle of object named constituted boundary line). Therefore, we conclude that the deeds to the Barranca Tract contained a sufficient description to satisfy the element of color of title.

One of the deeds to Quarles's father refers to the "top of the hill," another to "the hill," and the third, which Theis Company contends the trial court erroneously reformed by deciding the reference to the southern boundary was a reference to the western boundary, refers to both. In view of the concession that the Barranca Tract and the Quarles Farm share a common southern boundary, we conclude that the trial court was entitled to rely on the same evidence that supports a determination Chavez proved color of title to the

Barranca Tract in determining that Quarles had proved color of title to the Quarles Farm. In addition, we think that the trial court was entitled to consider the similar descriptions in the deeds to the Brazos Tract and Quarles's surveyor's testimony that the fence was at the top of the hill. Under these circumstances, we do not address Theis Company's contention that the trial court erroneously reformed the 1912 deed. Because that finding is not necessary to the trial court's decision, it is not a basis for reversal. *See Specter v. Specter,* 85 N.M. 112, 509 P.2d 879 (1973).

We recognize the presence of conflicting evidence on this issue, and we acknowledge that the evidence concerning the nature of the terrain on the west side of the Chama River supports a conclusion that the references in the deeds were vague as well as conflicting. For example, Quarles's surveyor described the terrain from the river west as rolling hills and indicated on cross-examination that he himself would describe the top of the hill as about 250 feet east of the fence.

■ The fact that Plaintiffs were required to produce clear and convincing evidence to persuade the trier of fact, *see Marquez v. Padilla,* does not alter the principle that it is for the finder of fact, rather than the reviewing court, to weigh conflicting evidence and decide where the truth lies. *See In re R.W.,* 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.1989). Although a greater quantum of evidence is required of Plaintiffs than if only a preponderance of evidence had been required, *id.* at 336, 772 P.2d at 370, "the appellate court's primary task is to determine if the decision reached at trial is justifiable on the facts and the law." *Id.* We conclude that the trial court's decision is supported by the facts and the law. *See Padilla v. City of Santa Fe.*

### C. Actual, Exclusive, and Open Possession

■ Theis Company contends that Plaintiffs failed to establish exclusivity of use because other members of the community allowed their cattle to graze on the disputed tract. However, allowing neighbors the use of the disputed area as grazing land does not destroy a finding of exclusivity. A claimant may successfully prove exclusivity by demonstrating that his acts pertaining to the property were consistent with ownership. If one can show that he exercised dominion and control over the property, and consistent with that control permitted others to occasionally use the property, exclusivity is not destroyed. *Hernandez v. Cabrera,* 107 N.M. at 437, 759 P.2d at 1019. Therefore, the trial court's finding of longtime permissive use by neighbors does not compel a finding that a claim of adverse possession was not proved.

■ Theis Company also claims that Plaintiffs did not occupy or use the property in such a way to put it on notice that someone else might be claiming its property. However, having established color of title, Plaintiffs were not required to occupy the entire area claimed. *See Marquez v. Padilla,* 77 N.M. at 623, 426 P.2d at 595. It is enough that "visible and notorious acts of ownership are manifested." *Id.*

■ The evidence clearly illustrated that the only use for the disputed area was for grazing livestock. Plaintiffs used the land in the only way it could be used. We must consider the nature and situation of the property in order to determine whether a claimant has done enough to prove a claim of adverse possession. *See Lopez v. Barboa,* 80 N.M. 338, 455 P.2d 842 (1969). Given the nature of the property at issue, we conclude that Plaintiffs' use of the property for grazing was sufficient to establish actual and visible, or open, possession over the disputed area.

### III. CONCLUSION

The trial court's finding that Plaintiffs established each element of adverse possession is supported by substantial evidence, and accordingly we affirm. We do not address the other issues raised on appeal.

IT IS SO ORDERED.

CHAVEZ and FLORES, JJ., concur.