**Certiorari Granted, October 25, 2011, No. 33,147**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-108**

**Filing Date: July 19, 2011**

**Docket No. 29,812**

**DELMA E. PRATHER, as Trustee of the**
**DELMA E. PRATHER REVOCABLE TRUST,**

    **Plaintiff-Appellant,**

**v.**

**PATRICK H. LYONS, Commissioner of**
**Public Lands of the State of New Mexico,**

    **Defendant-Appellee,**

**and**

**MAINLINE ROCK & BALLAST, INC.,**

    **Defendant.**

**APPEAL FROM THE DISTRICT COURT OF TORRANCE COUNTY**
**Matthew G. Reynolds, District Judge**

Comeau, Maldegen, Templeman & Indall, LLP
Michael R. Comeau
Stephen J. Lauer
Sharon W. Horndeski
Santa Fe, NM

for Appellant

New Mexico State Land Office
John L. Sullivan, Associate Counsel
Santa Fe, NM

for Appellee

1

Brennan & Sullivan PA
Michael W. Brennan
Santa Fe, NM

for Amicus Curiae N.M. Farm & Livestock Bureau

**OPINION**

**SUTIN, Judge.**

**{1}**     State trust land was originally sold in 1930 to a purchaser who bought the land for grazing purposes.  This original purchaser received a patent in 1947 and sold the land in 1982.  The land contained surface and subsurface metamorphic rock, and the character of the surface and its use for grazing did not change from 1930 to 1982.  After the 1982 sale, the successor landowner's lessee mined, crushed, and sold the rock for use primarily as ballast for railroad beds and paid the landowner-lessor royalties.  In this action, Plaintiff Delma E. Prather, as trustee of the Delma E. Prather Revocable Trust, is the successor to the original purchaser of the state trust land.  She sued Patrick H. Lyons, Commissioner of Public Lands of the State of New Mexico, to quiet title to the rock when the Commissioner asserted ownership of the rock and a right to royalties based on a general mineral reservation in the 1947 patent, which we refer to in this opinion as "the mineral reservation."  After a bench trial, the district court held for the Commissioner.  Our issue is whether the rock in the state trust land acquired by the original and successor purchasers constituted a mineral reserved to the State under the mineral reservation.

**{2}**     On appeal, Plaintiff requests that we adopt and apply the "surface destruction doctrine" in arriving at a decision that the parties to the original 1930 purchase transaction did not intend the rock to be considered a mineral within the mineral reservation.  Relying in part on *Bogle Farms, Inc. v. Baca*, 1996-NMSC-051, 122 N.M. 422, 925 P.2d 1184, which states that title to state trust land should be determined on a case-by-case basis considering the intent of the original parties and not by a rule of property nor by conveyance by implication, the Commissioner argues against adoption of the surface destruction doctrine and further argues that the evidence of intent, considering the totality of circumstances, supported the district court's decision.  In regard to the evidence, Plaintiff contends that the district court misread critical transactional documents and that its decision was based on irrelevant and insubstantial evidence.  We hold that substantial evidence supported the district court's findings of fact under *Bogle Farms'* required analysis of the intent of the parties to the original sale transaction that the intent of the conveyance transaction was that the rock was included in the reservation of "all minerals of whatsoever kind" in the patent.

**BACKGROUND**

2

**{3}**     The background recited here is largely taken from undisputed findings of fact of the district court.  There exist two purchase transactions.  J.C. Shelton acquired a fee simple interest in Section 16, Township 5 North, Range 12 East, Torrance County, New Mexico (Section 16), pursuant to a 1930 purchase contract with the then Commissioner of Public Lands of the State of New Mexico.  Ms. Prather and her husband purchased Section 16 in 1982 from Shelton's successor in interest and, after her husband's death, Ms. Prather created her trust and transferred Section 16 into her name as trustee.  Ms. Prather, as trustee of the Delma E. Prather Revocable Trust, is Plaintiff in the present action.  For convenience, in this opinion we refer to Ms. Prather, individually and as trustee, and also to Mr. and Mrs. Prather, as "Plaintiff."  We refer to Defendant Commissioner Lyons and past Commissioners of Public Lands as "the Commissioner."  Pertinent documentary history relating to Shelton's and Plaintiff's acquisitions of Section 16 is as follows.

**{4}**     The State acquired title to Section 16 pursuant to an Act of Congress approved June 21, 1898, called the Ferguson Act, confirmed in an Act of Congress approved June 20, 1910, effective as of November 16, 1915, called the New Mexico Enabling Act.  *See Bogle Farms*, 1996-NMSC-051, ¶ 9 (reciting the history of the transfer of land by the federal government to New Mexico when New Mexico attained statehood to be held in trust for schools, citing the Enabling Act).  Under the Ferguson Act, the United States granted Section 16, among other lands, to the Territory of New Mexico for the support of common schools, but excluded lands that were mineral in character.  In confirming the grant, the Enabling Act also excluded mineral lands.  The district court found that "mineral lands" is a term of art that means "lands known (at the time) to be more valuable for minerals and must contain minerals in sufficient quantity to justify expenditure for their extraction[,]" and "[t]he land must also be more valuable for mineral extraction than other uses."  Title was confirmed in Patent No. 1205336 issued by the United States on February 23, 1960.

**{5}**     The district court found that in 1919 when there was a rush to obtain leases from the State for oil and gas exploration, the State Legislature authorized the Commissioner to classify the lands owned by the State as mineral or non-mineral.  The State Land Office (SLO) Administrative Rule No. 1, 1919, dated April 4, 1919, designated and classified all lands of the State as mineral lands.  *See State ex rel. Otto v. Field*, 31 N.M. 120, 128-31, 241 P. 1027, 1030-32 (1925) (recounting the history of Administrative Rule No. 1); *see also* 1912 N.M. Laws, ch. 82, § 1 (creating the SLO).  Administrative Rule No. 1 was issued to afford the State "maximum protection from the purchase of lands as non-mineral, which may in fact be mineral lands or subject to classification as such[.]"  The district court also found that in 1925 the SLO issued regulations requiring the State to reserve all minerals when selling state trust lands.  The district court further found that, prior to 1930, Section 16 was owned in fee by the State, was uncultivated and was useful for pasture or grazing purposes, and was largely composed of Pre-Cambian metamorphic rock.

**{6}**     In August 1930, Shelton applied to purchase Section 16 from the Commissioner.  In the form application, Shelton stated that Section 16 was grazing in character; that there was no growing timber, coal, minerals or oil and gas known to be on the land; that Shelton

intended to use the land to "graze sheep or raise cattle"; and Shelton signed under a paragraph which read, "the land applied for herein is essentially non-mineral land, and that this application is not made for the purpose of obtaining title to mineral, coal, oil or gas lands fraudulently, but with the sole object of obtaining title to the land applied for for grazing and agricultural purposes." According to the district court's findings, the law required that state trust lands such as Section 16 be sold at their "appraised true value," and Shelton provided an appraisal for Section 16 on a form provided by the SLO entitled "Appraisement of Grazing and Agricultural Lands" which was sworn to and addressed to the Commissioner. *See* NMSA 1978, § 19-7-9 (1981) (amended 1989 and 2009); 1910 N.M. Laws, ch. 310, § 10 (Enabling Act). In this appraisal, the appraiser answered "no" to the question: "Is there mineral or coal on the land?" He stated that the land was "all grazing land" and swore in a non-mineral affidavit that he was well acquainted with the land and that:

> there is not, to my knowledge, within the limits thereof, any vein or lode of quartz or other rock in places bearing gold, silver, cinnabar, lead, tin, or copper, or any deposit of coal; that there is not, within the limits of said land, to my knowledge, any placer, cement, gravel, salt or other valuable mineral deposits; that no portion of said land is worked for mineral during any part of the year by any person or persons; and said land is essentially non-mineral in character.

**{7}**    In the contract for the purchase of land between Shelton and the Commissioner that followed, dated in November 1930, Shelton agreed that the land was being purchased "for the purpose of grazing and agriculture only." He also agreed that:

> while the land herein contracted for is believed to be essentially non-mineral, should mineral be discovered therein it is expressly understood and agreed that this contract is based upon the express condition that the minerals therein shall be and are reserved in the fund or institution to which the land belongs, together with right of way to the Commissioner, or anyone acting under his authority, at any and all times to enter upon said land and mine and remove the minerals therefrom without let or hindrance.

**{8}**    In 1947 the Commissioner issued Patent for State Land No. 1906, pursuant to which he conveyed to Shelton's widow the State's interest in Section 16, but reserved to the State, by way of the mineral reservation, "all minerals of whatsoever kind, including oil and gas, in the lands so granted," and also reserved the "right to prospect for, mine, produce and remove the same, and perform any and all acts necessary in connection therewith[.]" Plaintiff purchased Section 16 in 1982 for the purpose of using it to graze cattle. The mineral reservation was noted in the chain of title. The character of Section 16 remained unchanged from the time of Shelton's purchase to the time of Plaintiff's 1982 acquisition.

**{9}**    In 1998 Plaintiff entered into a license agreement with Ralph J. Conway to explore for quarry rock that might be suitable for railroad ballast and other construction aggregates.

4

Mainline Rock and Ballast, Inc. (Mainline) entered the picture in 2003 and collected surface rocks, had this rock tested to determine if Section 16 would be suitable for extracting rock and creating railroad ballast, sought to secure an exclusive contract with Burlington Northern Santa Fe Railroad (BNSF) to supply railroad ballast, had the mineral content of the rock analyzed and tested to determine if it met BNSF's specifications, and drilled test holes and had subsurface samples tested. Further, after obtaining an option of Conway's right, title, and interest in his lease, and after exercising that option with Plaintiff's consent, Mainline sought and obtained a zoning change of 120 acres of Section 16 from agriculture to a special use district to construct its quarry.

{10} In 2004 Plaintiff and Conway entered into a twenty-five-year lease agreement, which stated that Plaintiff owned the subsurface mineral estate of Section 16 and referred to mining and characterized the rock as minerals. Mainline constructed a quarry and began removing rock and crushing it primarily for railroad ballast and also for other aggregates, including mainline ballast, yard ballast, modified ballast, chips, fines, rip-rap, surge, and roadbase. The district court's findings contain a detailed discussion and history relating to rock, natural aggregates, industrial minerals, crushed stone, railroad ballast, and sales of crushed stone and railroad ballast. Mainline removed thousands of cubic yards of overburden and used explosives to blast the rock out of the deposit. It employed ongoing testing of samples to assure that it met BNSF's ballast specifications. As of April 2009, when the court's findings were entered, Mainline had sold over 2.5 million tons of ballast to BNSF and over 300,000 tons of byproduct. Mainline paid full royalties to Plaintiff until representatives of the Commissioner asserted the State's mineral interest; following a settlement agreement with Mainline and a Rule 5 Mining Lease issued by the Commissioner obligating Mainline to make royalty payments to the Commissioner, Mainline reduced its royalty payments to Plaintiff.

{11} Plaintiff filed a complaint against the Commissioner for declaratory judgment and other relief and later filed an amended complaint joining Mainline as a party defendant. Plaintiff sought to quiet title in Section 16 including the rock and to recover damages as well as remission of the royalties paid to the Commissioner. The Commissioner counterclaimed seeking to quiet title in the mineral interest in Section 16 and for other relief. The district court entered a partial final judgment in which the court determined that the Commissioner was "the owner of all crushed stone mined, produced[,] and sold from Section 16 . . . including, but not limited to, all crushed stone mined, produced[,] and sold pursuant to leases issued by Plaintiff and by the Commissioner." Plaintiff appeals.

{12} Plaintiff contends on appeal that we should adopt the surface destruction doctrine and apply it in determining that the intent of the original parties was to exclude the rock from the mineral reservation. She further contends that the transactional documents reflecting Shelton's purchase are at variance with the district court's ruling, that the court's decision was based on irrelevant and insubstantial evidence, and that statutes in effect at material times all buttress the conclusion that the rock in Section 16 was not a mineral or was not intended to fall within the mineral reservation. The rock with which we are dealing is

5

described by Plaintiff as "common rock," which Plaintiff claims means rock with no particular or valuable mineral content and rock that is just "hard and heavy."

**DISCUSSION**

{13}     All arguments attempt to provide a route for the elusive quests for (1) the understanding of what "minerals" is intended to mean and include within the mineral reservation, and (2) the intent of the parties to the 1930 original purchase contract as to whether the rock was to be considered a mineral within the mineral reservation. We preface our discussion of the parties' arguments with a discussion of *Bogle Farms*' mandated intent-of-the-original-parties test and rejection of case law establishing a rule of property governing reservation of mineral rights in state trust land sales. We also set out the district court's findings of fact and conclusions of law in regard to intent.

**The Intent Issue:  *Bogle Farms* and the District**
**Court's Findings and Conclusions in the Present Case**

{14}     In *Bogle Farms*, our Supreme Court reviewed an appeal by the Commissioner from a district court's partial summary judgment entered in favor of twenty-six plaintiffs who sought a declaratory judgment holding that their contracts for the purchase of state trust lands did not reserve sand and gravel to the State. 1996-NMSC-051, ¶ 1. The district court had ruled based on collateral estoppel that the Commissioner was precluded from arguing that the general mineral reservations in the contracts effectively reserved the State's interest in sand and gravel. *Id.* The estoppel issue arose based on our Supreme Court's decision in *Roe v. State ex rel. State Highway Department*, 103 N.M. 517, 710 P.2d 84 (1985), *overruled by Bogle Farms*, 1996-NMSC-051. *Bogle Farms*, 1996-NMSC-051, ¶ 1. In *Roe*, the Court ruled that title to sand and gravel passed to the purchaser along with the surface estate where the purchase contracts and patents did not specifically reserve sand and gravel to the State. *Bogle Farms*, 1996-NMSC-051, ¶ 1; *Roe*, 103 N.M. at 521, 710 P.2d at 88. Before we discuss *Bogle Farms* further, we must discuss *Roe* in more detail, along with *Burris v. State ex rel. State Highway Commission*, 88 N.M. 146, 538 P.2d 418 (1975), which preceded and was overruled by *Roe*.

{15}     In *Burris*, state land was sold to the plaintiffs by contract and a patent followed. *Id.* at 146, 538 P.2d at 418. The purchase contract stated that the land was being purchased for the purpose of grazing and agriculture only, and the patent reserved "to the [S]tate . . . all minerals of whatsoever kind, including oil and gas, in the lands so granted[.]" *Id.* at 147, 538 P.2d at 419 (internal quotation marks omitted). The application to purchase stated that "the land . . . is essentially non-mineral land, and that this application is not made for the purpose of obtaining title to mineral, including but not limited to caliche, sand and gravel, coal, oil or gas lands fraudulently but with the sole object of obtaining title to the surface of the land applied for." *Id.* (internal quotation marks omitted). In approaching a decision, the Court in *Burris* stated that "apart from any governing statute, the issue is whether the parties intended that sand and gravel are, or are not, to be . . . classified [as a mineral,]" a question

6

that "is normally resolved by the pertinent documents and the actions of the parties[.]" *Id.* The *Burris* Court distinguished and did not follow *State ex rel. State Highway Commission v. Trujillo*, 82 N.M. 694, 487 P.2d 122 (1971), *overruled by Champlin Petroleum Co. v. Lyman*, 103 N.M. 407, 708 P.2d 319 (1985), which was decided on a factual underpinning consisting solely of a patent that reserved to the United States "all the coal and other minerals in the lands" and which held that sand and gravel were not minerals. *Burris*, 88 N.M. at 147, 538 P.2d at 419 (internal quotation marks omitted). *Burris* rejected *Trujillo* as applicable authority because in *Burris* there was "a great deal more documentation casting light on the intention of the parties," namely, the application and the contracts. *Id.* Relying on those documents, the Court in *Burris* held "the parties intended to reserve sand and gravel," because under the terms of the documents, the State "expressly reserv[ed] all minerals in very clear, unambiguous and all-inclusive language, without qualification, restriction[,] or limitations of any kind." *Id.* at 147-48, 538 P.2d at 419-20.

**{16}**     *Roe*, an inverse condemnation action, overruled *Burris*. *Roe*, 103 N.M. at 517, 521, 710 P.2d at 84, 88. The *Roe* Court noted that, in *Burris*, the application, but not the purchase contract, contained the words "sand and gravel." *Roe*, 103 N.M. at 521, 710 P.2d at 88. Focusing on the application, *Roe* stated that "[a]n application is merely a request to purchase, and its provisions do not affect the title to the property[,]" and *Roe* concluded that whether title passed was not determined by what was stated in the application, but was determined "by the conveyances themselves, the purchase contract[,] and the patent." *Id.* Therefore, the Court required that "[f]or the State to reserve sand and gravel, a provision so specifying must be included in these conveyances." *Id.* The *Roe* Court "determine[d] that although the original applicant for the [plaintiffs'] property did not apply for title to sand and gravel, such title nevertheless passed with the surface estate since sand and gravel were not specifically reserved by the purchase contract and patent." *Id.*

**{17}**     In *Bogle Farms*, the Court discussed *Roe* along with other pertinent New Mexico cases.[1] *Bogle Farms*, 1996-NMSC-051, ¶¶ 8-22, 33. Overruling *Roe*, *Bogle Farms* rejected *Roe*'s strict definition of minerals in the general reservation clause of the conveyance documents to exclude sand and gravel. *Bogle Farms*, 1996-NMSC-051, ¶¶ 34-35. *Bogle Farms* also rejected the purchasers' collateral estoppel, stare decisis, and rule of property arguments favoring *Roe*'s ruling. *Bogle Farms*, 1996-NMSC-051, ¶¶ 22, 27-33, 36.

**{18}**     The Court in *Bogle Farms* read *Roe* as erroneously deciding the mineral reservation issue based on a rule that affected title to property, thereby adopting a "rule of property," instead of deciding the issue based on the intention of the parties, and the Court read *Roe* as erroneously permitting conveyance of title by implication. *Bogle Farms*, 1996-NMSC-051, ¶¶ 30, 34-35. *Bogle Farms* remanded for evidentiary proceedings given the lack of a specific

---

[1] *Bogle Farms* discusses seven cases, the earliest dating back to 1940. *See Bd. of Cnty. Comm'rs v. Good*, 44 N.M. 495, 498, 105 P.2d 470, 472 (1940) (stating that sand, gravel, ordinary clay, and caliche fall within the term "mineral").

7

mineral reservation and the need for the district court to consider evidence outside the face of the contract to determine the meaning intended for the term "mineral" when the term was shown under the circumstances to be ambiguous. *Id.* ¶ 35. *Bogle Farms* returned to *Burris'* case-by-case approach "based on the principle that in contract cases the role of the court is to give effect to the intention of the contracting parties." *Bogle Farms*, 1996-NMSC-051, ¶ 22. The Court in *Bogle Farms* noted that "prior to *Roe* this Court had held in *Burris* that a general mineral reservation included sand and gravel"; however, the Court left it open for the district court on remand to determine whether the parties intended to include sand and gravel within the term "mineral." *Bogle Farms*, 1996-NMSC-051, ¶¶ 33-35.

**{19}** Among *Bogle Farms'* several statements applicable to the present case are the following. In cases involving state trust land, the determination whether a material or substance is included within a general mineral reservation must be done on a case-by-case basis. *Id.* ¶ 22. The issue is whether the parties to the original sale transaction intended that the State reserve the material or substance at issue. *Id.* ¶ 35. There exists "a strong public interest in the protection of state land and its products, as reflected in the Enabling Act's requirement that no sale or other disposal [of state land or its natural productions] shall be made for a consideration less than the [appraised true] value." *Id.* ¶ 26 (alterations in original) (internal quotation marks and citation omitted). And "title to state trust lands should not be conveyed by implication." *Id.* ¶ 34.

**{20}** What material or substance comes within the word "minerals" in the mineral reservation is not altogether clear. The district court in the present case determined that the mineral reservation was ambiguous. Our Supreme Court has referred to this ambiguity. *See id.* ¶¶ 20, 35 (stating that "the *Roe* Court may have been attempting to resolve the ambiguity once and for all and to put to rest an issue that had given rise to a great deal of litigation" and, further, that "[i]f there is not a specific reservation, the trial court must look to evidence outside the face of the contract to determine the meaning intended for the term 'mineral' when that term has been shown under the circumstances to be ambiguous"); *Rickelton v. Universal Constructors, Inc.*, 91 N.M. 479, 480, 576 P.2d 285, 286 (1978) (stating that "[w]hat the Legislature meant to be included as a 'mineral' is not well defined in New Mexico" and that the Court had "recognized that the category of 'minerals' is a flexible one"). Courts outside New Mexico have referred to the ambiguity of the words "minerals" and "mineral reservation." *See United States ex rel. S. Ute Indian Tribe v. Hess*, 348 F.3d 1237, 1241 (10th Cir. 2003); *Kinney v. Keith*, 128 P.3d 297, 303 (Colo. App. 2005); *Resler v. Rogers*, 139 N.W.2d 379, 382 (Minn. 1965). In the present case, rock that might fit the description of the rock in question was not specifically mentioned in any of the 1930 transaction-related documents or in the 1947 patent. Further, there exists no testimony of the original contracting parties.

**{21}** The district court entered several findings of fact that appear to relate to the issue of intent. A number of findings relate to the character of the rock. The court noted that "[t]he rock[] or crushed stone" used for railroad ballast has certain characteristics and value, that a railroad's easy access to a rock quarry is important, and that as of 1915, railroad tracks,

8

which still exist, run near Section 16, about two miles from the quarry site ultimately constructed by Mainline. The court further noted that "[r]ailroad ballast is the final product of certain mineral aggregates (rock) that meet railroad specifications for density, hardness[,] and durability . . .[,] is a construction use of the industrial material called 'crushed stone[,]'" and that "[a]n industrial mineral is a valuable, usually nonmetallic rock or related material that is natural or man-made, excluding fuels, metals, and gems."

{22} In further findings, the court discussed the United States Bureau of Mines' 1932-33 Minerals Yearbook that characterized crushed stone as an industrial mineral used for railroad ballast, and the court pointed to the chapter entitled "Crushed and Broken Stone" that stated, "[s]ince the advent of concrete[,] the crushed-stone industry has far surpassed the dimension-stone industry in tonnage and value." The court found that, in 1932, there was no report of railroad ballast sales in New Mexico and several other states, including Texas, and that "[t]he lack of reporting probably was the result of the lack of demand for new construction caused by the Great Depression." However, the court also found that, as reflected in the 1947 Minerals Yearbook, "[b]y 1947, the crushed[-]stone industry . . . had turned around . . ., [and s]ales of crushed stone were at an all-time high," and "[i]n New Mexico, the sale or use by railroads of railroad ballast exceeded 300,000 short tons[.]"

{23} In regard to crushed-stone production after 1947, the court found that in 1980 railroad ballast and other construction aggregates and roadstone accounted for twenty-seven percent of the total crushed stone used in construction in the United States. The court referred to a United States Geological Survey Bulletin 1594 (1993) entitled Natural Aggregates of the Conterminous United States stating that crushed stone and sand and gravel are the two main sources of natural aggregates and amount to about one-half of the mining volume in the United States. In addition, referring to what was reported in a publication of the New Mexico Geological Society and the New Mexico Bureau of Geology and Mineral Resources, the court noted that crushed stone was included as a common industrial mineral, along with sand and gravel and caliche, and that "[i]n 2003 the top nonfuel minerals in New Mexico were, by value, potash and copper, followed by construction sand and gravel, crushed stone, and cement[.]"

{24} The court entered the following further findings that relate more particularly to intent.

> 62. The Sheltons acquired Section 16 to be used for grazing.

> 63. The Sheltons did not intend to exploit the rock deposit in Section 16 by mining and selling the rock or leasing Section 16 for the purpose of having the rock mined and sold.

> 64. Inclusion of the rock within the scope of the mineral reservation in the 1930 contract and the 1947 patent, particularly where the rock is being mined and sold commercially, serves the purposes that the

9

parties had in agreeing that the State would sell the land and that [the] Sheltons would purchase it.

65.     Mrs. Shelton's subjective intention as to the mineral reservation in Patent No. 1906 is unknown, but her objective intention as evidenced by the surrounding circumstances, including her husband's earlier contract with the Commissioner for the acquisition of Section 16 and her subsequent use of Section 16 for grazing, was in accordance with the State's intention to maximize its monetary opportunities for mineral extraction if minerals were ever to be discovered on the property.

66.     The State's intention in reserving all minerals of whatsoever kind when it issued Patent No. 1906 for land that was apparently not mineral-bearing was to maximize the State's opportunities for royalties to be derived from any and all minerals that might later be discovered on Section 16.

67.     The Commissioner . . . considered industrial minerals as "minerals of whatsoever kind" in Patent No. 1906 given the widespread understanding of industrial minerals as some of the most valuable minerals in the United States for highest monetary sales from earlier in the 20th century through the year 1947.

68.     In 1947, the Commissioner . . . considered crushed stone as an industrial mineral, as it was customarily considered in the mineral trade markets.

69.     Based on the parties' language in their dealings with one another, their conduct, the objectives they sought to accomplish, and the surrounding circumstance, the parties intended that crushed stone, an industrial mineral, was to be considered a mineral in the 1930 Shelton contract to purchase and one of those "minerals of whatsoever kind" included in the State's mineral reservation in Patent No. 1906.

70.     The fact that surface rock was visible on Section 16 was not the same as a determination that such rock was or was not a mineral under the 1930 Shelton contract to purchase or under Patent No. 1906's mineral reservation.

71.     The crushed stone discovered on Section 16 in 2003 as a result of extensive on-site and laboratory testing is a mineral under the 1930 Shelton contract to purchase and one of those "minerals of whatsoever kind" reserved by the State in Patent No. 1906.

72.     Even if the parties disagreed as to the meaning of the term "mineral" in the 1930 Shelton contract to purchase or the phrase "minerals of whatsoever kind" in the 1947 patent, or if the parties' intentions could not be determined, it is most reasonable that the term and phrase include the industrial mineral known as crushed stone, based on all surrounding circumstances.

After setting out the parties' proof burdens, the district court entered the following conclusions of law that appear to relate to intent.

5.     Title to state trust land cannot be conveyed by implication.

. . . .

7.     The parties need not be aware that the property has minerals in order to create a mineral estate.

8.     Authority and responsibility for managing and conveying Section 16 was vested in the Commissioner . . . pursuant to N.M. Const., art. XIII, § 2 and N.M. Laws 1912, ch. 82, §§ 1-2 (currently codified at NMSA 1978, §§ 19-2-1 [(1913)] and 19-2-2[ (1963)]).

9.     Pursuant to Section 1 of the Ferguson Act and Sections 6 and 10 of the Enabling Act, the State held title to Section 16 in trust for the purpose of supporting common schools. The trust terms required that "the natural products and money proceeds" of Section 16 "shall be subject to the same trust[]" and that "[a]ll lands, leaseholds, timber[,] and other products of land before being offered [for sale or lease] shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration."   [(Alterations in original.)]

10.     Because Section 16 was classified by the Commissioner as mineral land, the Commissioner was required as a matter of state law to issue a limited patent containing a reservation to the [S]tate of New Mexico of all the minerals in Section 16, together with the right to the [S]tate or its grantees, to prospect for, mine[,] and remove the same. NMSA 1978, § 19-10-27 [(1925)].

11.     The question of whether a state trust land patent reservation of "all minerals of whatsoever kind, including oil and gas" may be resolved by examining the intent of the parties to the transaction. The intent of the parties may be determined by examining the parties' language and conduct, the objectives they sought to accomplish, and the surrounding circumstances.

12.     A purchaser of [s]tate lands from the Commissioner owns the surface and subsurface of the purchased property, save for such minerals as are reserved, under statutory authority by the Commissioner.

13.     Patent No. 1906's mineral reservation was ambiguous. Accordingly, it was incumbent upon the [c]ourt as fact-finder to resolve the ambiguity.

14.     If the parties, at the time Patent No. 1906 was issued, had the same understanding of the mineral reservation, then that shared meaning controls.

15.     If the parties had a different understanding of the mineral reservation in Patent No. 1906 at the time the patent was issued, then the [c]ourt as fact-finder is required to give the meaning that it finds to be most reasonable, taking into consideration all the circumstances, including the intentions of the parties, the words that the parties used, the purposes the parties sought to achieve, custom in the trade, the parties' course of dealing, the parties' course of performance, whether a party, at the time the contract was entered into, knew or should have known that the other party interpreted the term[s] differently.  [(Second alteration in original.)]

16.     Plaintiff has not met her burden of proving her claims that the rock at issue was not included in the reservation of "all minerals of whatsoever kind" in Patent No. 1906.

17.     The Commissioner has met his burden of proving his counterclaims that the rock at issue was included in the reservation of "all minerals of whatsoever kind" in Patent No. 1906.

**Plaintiff's Surface Destruction Doctrine and Other Arguments**

{25}     Plaintiff states that "[t]he crux of this appeal is whether New Mexico should adopt the surface destruction doctrine."  That question is one of law, which we review de novo. *Romero v. Bd. of Cnty. Comm'rs*, 2007-NMCA-004, ¶ 21, 140 N.M. 848, 149 P.3d 945; *Poncho v. Bowdoin*, 2006-NMCA-013, ¶ 32, 138 N.M. 857, 126 P.3d 1221.  Plaintiff's in-a-nutshell request of this Court is

to follow the lead of most other states in adopting the "surface destruction" doctrine, which holds that, in the absence of clear contrary intent, where materials alleged to be "minerals" are plainly visible on the surface, and where the surface would have to be destroyed in order to "mine" them, the parties could not have intended those materials to be "minerals" because, if

they were, the mineral reservation would swallow up the grant and render it worthless.

Plaintiff cites to courts and commentators that recognize the "complex and hopeless search for the 'true intentions' of the original parties" and that are critical of the attempt "to [divine] the subjective intent of the parties" after decades have passed. Plaintiff contends that only the objective intent of the parties to the original transaction can be ascertained and that objective intent is to be derived from only three relevant factors, namely: (1) the surface destruction doctrine; (2) statutes in effect at the time of the original transaction; and (3) the circumstances at the time, including records, documents, and actions of the parties. *See Downstate Stone Co. v. United States*, 712 F.2d 1215, 1217-20 (7th Cir. 1983) (relying on a surface destruction rationale and statutes and on the circumstances in considering whether a mining company had title to quarry limestone under a mineral reservation contained in conveyances to the United States). Plaintiff challenges as irrelevant and insubstantial findings of fact of the district court that recite post-1947 facts, circumstances, and publications, insofar as the court intended the findings to relate to the intent of the original parties. Plaintiff also challenges those findings which indicate that the rock was a mineral.

{26} Plaintiff describes the surface destruction doctrine as a common sense concept. She asserts that it is not reasonable to assume or believe that a surface owner of land who acquired the surface for grazing or agriculture would consent to a reservation of a material or substance that obviously exists on and beneath the surface knowing that the surface could be destroyed if the mineral owner mined the material or substance. Plaintiff further asserts and points to photographs that she argues support the fact that the rock covered thirty to forty percent of the surface of Section 16. Mineable rock also existed below the surface. Thus, Plaintiff argues, if a reasonably objective rancher such as Shelton, who intended to use the land for grazing, were to understand that all of the rock, including the subsurface rock, constituted "minerals" that could be removed by the State in a manner that would destroy the entire surface, that rancher would not have purchased the land in the first place, since it "would nullify the grant by destroying the agricultural usefulness of the land."

{27} This surface destruction doctrine appears in one form or another in several cases cited by Plaintiff.[2] *See Waring v. Foden*, [1932] 1 Ch. 276, 86 A.L.R. 969, 979 (Eng.) (stating that "the word 'minerals' when found in a reservation out of a grant of land means substances exceptional in use, in value[,] and in character . . . and does not mean the ordinary soil . . . which if reserved would practically swallow up the grant"); *see also Downstate Stone*, 712 F.2d at 1218 (stating that "it [is] unreasonable to assume that a party intended to reserve the surface, and at the same time convey to the mineral owner the limestone on the surface with the right to remove it, thereby destroying all that he had reserved"); *Florman v. MEBCO Ltd. P'ship*, 207 S.W.3d 593, 600, 601 (Ky. Ct. App. 2006) (holding that limestone was not a mineral at the time of the original transaction in 1873 as well as at the time of the decision,

---

[2]*See* cases cited *infra* note 3.

13

states that "[i]n this country it is a part of the soil, and *a conveyance that reserves the limestone with the right to remove it would reserve practically everything and grant nothing*" (internal quotation marks and citation omitted)).

**{28}** Plaintiff does not suggest that the surface destruction doctrine be applied without regard to intent; instead, according to Plaintiff, it can be viewed as a doctrine "designed to facilitate the [intent] inquiry mandated in *Bogle Farms*" and as a "proxy for determining what the parties must have reasonably intended." Plaintiff argues based on her cited case law that application of the doctrine is triggered because (1) the entire surface area conveyed need not be covered with the material in question before the doctrine applies; (2) the doctrine may apply in circumstances where the reservation is included within a patent or other instrument of conveyance issued by a state governmental entity; and (3) widespread outcropping of the material covering thirty to forty percent of the land together with the same rock found below the surface made it apparent that mining the rock would destroy the surface and make the surface unsuitable for grazing. Plaintiff shows that the rock is part of a fifteen- to twenty-mile-wide geologic formation with rock outcrops that stretches from the Sangre de Cristo Mountains on the north into Texas and Mexico on the south and that "if the rock being removed is 'mineral,' the entire formation would have to be considered 'mineral' since the rock being removed has the same characteristics as the other rock in the formation[.]"

**{29}** Plaintiff also urges adoption and application of the surface destruction doctrine because, had the appraiser believed the rock was a mineral, he would have reflected that in his appraisal and would have accounted for reduced value because of the risk of surface destruction. Thus, Plaintiff argues, viewing intent objectively, based on the undisputed circumstances, a reasonable person in Shelton's position would not have intended to purchase Section 16 without ownership of the rock, adding that "a reasonable person in . . . Shelton's position would not have paid valuable consideration for Section 16 during the Great Depression had he known that [the] SLO could destroy the surface."

**{30}** Plaintiff points out that *Bogle Farms* never considered the application of the surface destruction doctrine and because most of the parties to the original contract were before the court and subject to cross-examination, it was not necessary for the court to consider the doctrine. Plaintiff also argues that, in *Bogle Farms*, the patentee's application specifically referred to sand and gravel as being included as a mineral, thus showing the purchaser's intent that sand and gravel could be a mineral and making the result in that case foreordained. *See Bogle Farms*, 1996-NMSC-051, ¶ 3. Plaintiff further distinguishes *Bogle Farms* because "live persons who participated in the transactions in question were available to testify concerning their intent[.]" Plaintiff complains that the district court in the present case erroneously went beyond what *Bogle Farms* would allow by considering and relying on information developed long after the original transaction—information deemed by courts in similar cases not to be material. In addition, Plaintiff contends the Ferguson Act did not intend to convey minerals, in that the Act provided that only non-mineral lands were to be conveyed, and that the only possible conclusion that can be drawn is the lands conveyed

14

were not deemed to contain minerals, "a critical conclusion" according to Plaintiff "since the materials now claimed to be minerals were plainly visible."

**{31}**    Relating specifically to the transactional documents, which are (1) the application (Pl. Ex. 1), (2) the appraisal (Pl. Ex. 2), (3) the purchase contract (Pl. Ex. 3), and (4) the patent (Pl. Ex. 4), Plaintiff not only contends that these documents provide "further support for application of the surface destruction doctrine[,]" Plaintiff also argues that the documents are at variance with the district court's ruling, in that "the fact that there is no evidence the parties considered whether the rock visible on Section 16 was a mineral disclosed a binding intention not to reserve it." Plaintiff states that the appraisal is the more important of the four transactional documents, in that, although the rock was visible, "the state-approved appraiser did not classify that rock as a mineral." Because the SLO's appraisal form used by the appraiser called for the appraiser to list all minerals, Plaintiff argues, the rock would have been listed had it been regarded as a mineral. Further, Plaintiff argues that because no value was independently assigned to the rock, and because the Enabling Act requires all sales of state lands to be appraised at their "true value," if the rock had been regarded as a mineral, there would have been a deduction from the "true value" of the rock given that the removal of the rock would have rendered the land useless for the contemplated purpose of grazing. As for Shelton's application, Plaintiff points out that Shelton "recited that there was nothing he regarded as a mineral on the land." Plaintiff further shows that the patent stated that Shelton was "to have and to hold the said premises . . . forever[,]" a concept inconsistent with any notion that material was a mineral under the mineral reservation clause where the mineral could be removed only by destroying the surface.

**{32}**    Further, Plaintiff argues that *Rickelton* governs the present case. Plaintiff contends that *Rickelton* addressed the precise question of "whether sand and gravel was a reserved 'mineral' within [the] SLO's patent reservation" and, according to Plaintiff, "reached the opposite conclusion because, unlike [in] *Burris*, there was nothing in the transactional documents in the record in that case where the patentee acknowledged that sand and gravel was a mineral." Plaintiff concludes that because the transactional documents in the present case contained no acknowledgment by Shelton that either rock, ballast, crushed stone, or industrial materials was a mineral, under *Rickelton*, rock was not a mineral within the common and ordinary meaning of that term in a mineral reservation and that "the undefined term 'minerals' does not include rock."

**{33}**    Because Plaintiff strongly relies on *Rickelton*, we pause here to discuss *Rickelton*'s status in New Mexico law. Plaintiff footnotes that although *Bogle Farms*, 1996-NMSC-051, ¶¶ 15-16, "took the opportunity to overrule, or recognize overruling, . . . several New Mexico decisions, it left *Rickelton* [intact] despite discussing it extensively." We doubt that *Rickelton* is viable. The Court relied on and felt controlled by *Trujillo*, a case that, *Rickelton* explained, held that sand and gravel was not intended to come within the general reservation clause because it was a material that "had no rare or exceptional character and possessed peculiar property giving it special value." *Rickelton*, 91 N.M. at 480-81, 576 P.2d at 286-87. Plaintiff fails to mention that *Trujillo* was overruled by *Champlin Petroleum*, 103 N.M. at

15

410, 708 P.2d at 322, a point expressly made in *Bogle Farms*. *See Bogle Farms*, 1996-NMSC-051, ¶ 12. Both *Trujillo* and *Champlin Petroleum* involved conveyances pursuant to the Federal Stock-Raising Homestead Act. *Champlin Petroleum*, 103 N.M. at 408-10, 708 P.2d at 320-22; *Trujillo*, 82 N.M. at 695-97, 487 P.2d at 123-25. *Bogle Farms* stated:

> This Court specifically addressed whether the term "mineral" as used in a reservation included sand and gravel for the first time in [*Trujillo*, *overruled by Champlin Petroleum*]. Basing our holding on a review of the Federal Stock-Raising Homestead Act, 43 U.S.C. §§ 291-302 (1982) (repealed in part in 1976), we concluded that the federal government did not intend to include sand and gravel within the term "mineral" as it was used in a federal patent. *Trujillo*, 82 N.M. at 696-97, 487 P.2d at 124-25. The United States Supreme Court indirectly overruled this conclusion in *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 55, 103 S. Ct. 2218, 2229, 76 L.Ed.2d 400 (1983) (determining that gravel was included within the scope of the mineral reservation contained in a federal patent issued under the Stock-Raising Homestead Act). Relying on *Watt*, this Court expressly overruled *Trujillo* in *Champlin Petroleum Co.*, wherein we determined that caliche was "a mineral similar to sand, gravel, clay, and limestone," *Champlin Petroleum Co.*, 103 N.M. at 409, 708 P.2d at 321, and was therefore included within the general mineral reservation of a federal patent, *id.* at 410, 708 P.2d at 322.

*Bogle Farms*, 1996-NMSC-051, ¶ 12. *Bogle Farms*' discussion of *Rickelton* and *Rickelton*'s reliance on *Trujillo* leave *Rickelton*'s value as controlling or even reliable authority in considerable doubt. Furthermore, *Rickelton* is not helpful to Plaintiff because the district court's determinations made in that case, which were affirmed, were fact-specific and not necessarily ones that would make *Rickelton* controlling precedent. *See* 91 N.M. at 481, 576 P.2d at 287.

**{34}** Insofar as Plaintiff attacks evidence and certain of the district court's findings as irrelevant or insubstantial, thereby casting doubt on the validity of the district court's determination relating to intent, we hold that the attacks, even assuming some are meritorious, have no effect on our decision in this case. We do not base our determinations on the findings Plaintiff challenges as irrelevant or insubstantial based on information that came into existence after the 1947 patent. We ignore Plaintiff's quarrel with findings as to which Plaintiff merely sets out evidence as to the original parties' intent arguably favorable to Plaintiff's position.

**The Dispositive Issues of Intent and the Surface Destruction Doctrine**

**{35}** *Bogle Farms* requires us to determine the intent of the parties to the original sale transaction between the Commissioner and the purchaser of state trust land. 1996-NMSC-051, ¶ 14. The parties' intent in the present case can be determined only objectively from the original sale-related documents and surrounding circumstances. Plaintiff does not

16

contend that findings of fact are not supported by substantial evidence. Plaintiff's primary complaint is that the district court erred in not applying the surface destruction doctrine and determining, based on the doctrine, that the parties did not intend the mineral reservation to include the rock.

{36}     Plaintiff also asserts that certain of the findings of fact on which the district court relied were not sufficient to support a determination favoring the Commissioner on the question "whether the parties to the *original* contract intended that the State reserve sand and gravel[,]" quoting from *Bogle Farms*, 1996-NMSC-051, ¶ 35 (emphasis added by Plaintiff). Plaintiff's limited attack on certain conclusions of law as "based upon insubstantial evidence" is phrased as follows: "[T]he trial court relied upon information developed long after the original parties entered into the contracts at issue," and also "relied upon other information generally deemed by the courts in similar cases to be immaterial[.]" We dispose of this limited point easily. None of the findings of fact to which Plaintiff refers relating to circumstances after issuance of the patent are findings on which we rely to affirm the district court's conclusions of law and ultimate decision. The circumstances set out in the court's findings of fact that occurred after the patent was issued, although noteworthy, were not necessary for a determination as to the intent of the parties. *See Tome Land & Improvement Co. v. Silva*, 86 N.M. 87, 90, 519 P.2d 1024, 1027 (1973) (holding that a finding, even if erroneous, was clearly immaterial and irrelevant and could be ignored as surplusage with the remaining findings and conclusions supporting the judgment); *see also Quarles v. Arcega*, 114 N.M. 502, 509, 841 P.2d 550, 557 (Ct. App. 1992) ("Even if a finding of fact or conclusion is erroneous, if it is unnecessary to the court's decision, the mistake is not a basis for reversal." (internal quotation marks and citation omitted)); *United Veterans Org. v. N.M. Prop. Appraisal Dep't*, 84 N.M. 114, 118, 500 P.2d 199, 203 (Ct. App. 1972) ("The making of unnecessary and superfluous findings of fact or the presence of error in findings of fact on immaterial, irrelevant, or purely collateral issues is harmless and non-reversible error if the judgment is otherwise sufficiently supported."). The circumstances set out in the court's findings of fact relating to circumstances that pre-date the issuance of the patent are material.

{37}     The court's several ultimate findings of fact that support a determination as to intent and its conclusions of law regarding intent are based on reasonable inferences from evidence, including findings regarding the sale-related documents and the surrounding circumstances, from which the court could determine, objectively, that the parties intended that the mineral reservation included the rock. The court's numerous findings of fact and conclusions of law reflect a rational and reasonable process of distilling of the court's findings of fact into the court's conclusions of law to arrive at *Bogle Farms*' required-intent element. We note, in particular, the court's conclusions of law stating:

> 14.     If the parties, at the time Patent No. 1906 was issued, had the same understanding of the mineral reservation, then that shared meaning controls.

17

15.     If the parties had a different understanding of the mineral reservation in Patent No. 1906 at the time the patent was issued, then the [c]ourt as fact-finder is required to give the meaning that it finds to be most reasonable, taking into consideration all the circumstances, including the intentions of the parties, the words that the parties used, the purposes the parties sought to achieve, custom in the trade, the parties' course of dealing, the parties' course of performance, whether a party, at the time the contract was entered into, knew or should have known that the other party interpreted the term[s] differently.

These conclusions of law were derived in part from findings (1) that, based on several factors, "the parties intended that crushed stone, an industrial mineral, was to be considered a mineral in the 1930 Shelton contract to purchase and one of those 'minerals of whatsoever kind' included in the State's mineral reservation in Patent No. 1906[,]" and (2) that

> [e]ven if the parties disagreed as to the meaning of the term 'mineral' in the 1930 Shelton contract to purchase or the phrase 'minerals of whatsoever kind' in the 1947 patent, or if the parties' intentions could not be determined, it is most reasonable that the term and phrase include the industrial mineral known as crushed stone, based on all surrounding circumstances.

{38}    The foregoing findings of fact and conclusions of law as to intent followed the district court's ruling that the mineral reservation was ambiguous. The parties do not disagree with that ruling, and we agree with the district court that the mineral reservation was ambiguous. Except for minerals expressly mentioned, the mineral reservation did not indicate what material or substance was intended to constitute a mineral within the meaning of the mineral reservation. Although, over the years in New Mexico, what constitutes a mineral under a mineral reservation in patents, deeds, custom, and case law has become clear as to many, if not most, materials and substances, some materials and substances appear to have escaped a settled identification. Common or metamorphic rock presently rests among the unsettled. On appeal, Plaintiff resolves the ambiguity in meaning by application of the surface destruction doctrine as the overriding evidence of intent. The Commissioner rejects any application of the surface destruction doctrine and resolves the ambiguity in meaning based on the district court's findings of fact and conclusions of law.

{39}    The district court, of course, was required under *Bogle Farms* to resolve factually the ambiguity as to whether the rock came within the mineral reservation by ascertaining the intent of the parties. UJI 13-804 NMRA requires the district court to determine the intentions of parties to a contract "by examining their language and conduct, the objectives they sought to accomplish, and the surrounding circumstances." UJI 13-825 NMRA, relating to ambiguity in a contract term, tells us that "[w]here . . . the parties at the time the contract was made had different meanings in mind[,]" the fact-finder is to "give that meaning which [it] find[s] to be most reasonable, taking into consideration all the circumstances[.]" The district court was obviously guided by UJI 13-825.

18

**{40}** As we have indicated earlier in this opinion, the district court determined that the parties intended the rock to be included in the mineral reservation, but also that if there was disagreement in the meaning, the most reasonable meaning was that the rock was intended to be included in the mineral reservation based on all surrounding circumstances. These determinations were made based, among other findings of fact, on the findings set out earlier in this opinion relating to the language in the contract and the patent; the Sheltons' intent and what they sought to achieve; what the status of commercial development of rock as crushed stone and as a mineral was in the United States; what the State intended in reserving minerals; and what the Commissioner, in regard to crushed stone, considered as an industrial mineral based on the custom in the mineral trade markets. Evidence in the record supports these findings.

**{41}** Also significant to the district court, as indicated in the court's findings, was the involvement of state trust lands and what follows from that. New Mexico state trust lands have purposefully been classified as mineral lands since 1919. SLO regulations in effect at the time of the original sale transaction purposefully required that minerals be reserved in the sale of state trust lands. The 1947 patent reserved to the State "all minerals of whatsoever kind[.]" At all material times, the rock had significant commercial value if it were mined, crushed, and marketed for use as railroad ballast and other uses, which could produce revenue to the State as intended by the mineral reservation. "The State's intention in reserving all minerals of whatsoever kind when it issued Patent No. 1906 for land that was apparently not mineral-bearing was to maximize the State's opportunities for royalties to be derived from any and all minerals that might later be discovered on Section 16."

**{42}** Discussions in two New Mexico Supreme Court decisions in print between 1930 and 1947 are pertinent in looking at surrounding circumstances. The 1925 decision in *Otto* related to the Enabling Act, to the 1919 SLO regulation, and to a sale of state trust lands. *Otto*, 31 N.M. at 122-25, 130-31, 241 P. at 1028-29, 1031-32. In *Otto*, the Court stated:

> [I]t cannot be supposed that the Legislature of New Mexico, after taking the precaution to provide in leases for reservations of minerals, oil, gas, stone, shale, salt, timber, and all other natural products of the land to be dealt with separately by the commissioner, intended that, when he went to sell grazing land or agricultural land, he would be powerless to reserve to the [S]tate and its institutions the great wealth which might flow from a future discovery of minerals in the land, merely because the circumstances had not permitted of his having made an adequate exploration in order to enable him to fully determine the exact character of the land.

*Id.* at 140, 241 P.2d at 1035. In relation to the disposition of lands owned by the State, the Court in *Otto* agreed with "the proposition that, until patent issues, legal title remains in the government and subject to investigation and determination." *Id.* at 136, 241 P. at 1034. Although the context in which the foregoing statements were made is not that in the present case, the *Otto* case and the statements in it were available for the parties' consumption up

to the date of the issuance of the patent. Also in existence during the critical period was the 1940 decision in *Board of County Commissioners v. Good*, 44 N.M. 495, 498, 105 P.2d 470, 472 (1940), involving a suit filed by a board of county commissioners to condemn lands to secure rock, sand, gravel, and caliche for public highway construction, addressing the actual value of the materials taken and stating that caliche rock was, "in the ordinary acceptation, a mineral simply, as is also sand [and] gravel[.]" The Court in *Good* stated: "'Mineral,' in ordinary and common meaning, is a comprehensive term, including every description of stone and rock deposit, whether containing metallic or non-metallic substances." *Id.* The Court in *Good* permitted a valuation of the rock separate from the land itself. *Id.* at 499, 105 P.2d at 472.

**{43}** Particular discussions in *Bogle Farms* are helpful in reaching a result in the present case. Although set in the context of our Supreme Court's discussion in *Bogle Farms* of whether the doctrine of collateral estoppel applied, we read *Bogle Farms* to establish a general principle that New Mexico's state trust lands have a status of "great public importance" and that there exists "a strong public interest in the protection of state land and its products," a status and interest that we cannot ignore. *Bogle Farms*, 1996-NMSC-051, ¶¶ 23, 26; *cf. Otto*, 31 N.M. at 126, 241 P. at 1030 (indicating that the case was "of great importance, not only to the litigant who seeks protection of the right he claims, but also it is of great public interest, because there is involved the policy and interest of the [S]tate as a trustee with respect to its school fund"). Further, also in the collateral estoppel context, *Bogle Farms* states that title to state trust lands is not to be conveyed by implication, a holding made by the Court in response to *Roe*'s rule of property that, if sand and gravel were not specifically reserved, title to those minerals passed to the purchaser. *Bogle Farms*, 1996-NMSC-051, ¶ 34; *Roe*, 103 N.M. at 521, 710 P.2d at 88. We view the foregoing statements in *Bogle Farms* as intended by our Supreme Court to apply beyond the confines of its collateral estoppel analyses.

**{44}** Turning to Plaintiff's main argument, which is that the surface destruction doctrine necessarily reflects the intent of the parties, in our view the doctrine essentially espouses an intent to convey minerals by presumption. In our view, the doctrine presumes that the parties cannot have intended and did not, therefore, intend a conveyance of surface rights without rights to the rock. And it mirrors the *Roe* property rule, which *Bogle Farms* rejected as essentially establishing a presumption of a conveyance of minerals where the intent of the parties was not manifest. *Bogle Farms*, 1996-NMSC-051, ¶ 34. We will not import the doctrine into the intent analysis. Moreover, we cannot accept the view, if intended by Plaintiff, that the doctrine itself is simply evidence to be weighed against all of the surrounding circumstances in the process of inferring intent. Over the years, there may in fact have been innumerable now-deceased purchasers of state trust lands who could well have subjectively intended to purchase land for grazing purposes understanding that the surface and sub-surface might be subject to mineral exploitation by the State. We are not convinced that even a preponderance of such purchasers would not have purchased their lands for grazing had they been specifically aware that some surface material was included in a mineral reservation. Further, and significantly, none of the surface destruction doctrine

20

cases on which Plaintiff relies involves New Mexico state trust lands or lands similar to our trust lands—instead, they involve purely private land transactions or conveyances by the United States of lands dissimilar to New Mexico's state trust lands.[3]

{45} We are aware of Plaintiff's and Amicus Curiae New Mexico Farm and Livestock Bureau's arguments that substantial farm and ranch land will be at risk if the district court is affirmed. Plaintiff states that, although this case involves only a single section of land, "its implications are far more significant" and "could have grave consequences[,]" in that "the practical effect of the decision below would be that the [Commissioner and the SLO] will have the right to destroy and render useless for agricultural and grazing purposes any portion of the millions of acres it has sold to farmers and ranchers on the mere showing that the hard rock on their lands, which is pervasive throughout the State, has some current economic value." We are not insensitive to these concerns. However, we do not feel a freedom to stray from the required *Bogle Farms'* intent-of-the-parties method of ascertaining the meaning of the mineral reservation. And we cannot ignore the over-arching principles and policies *Bogle Farms* enunciates in regard to conveyance of state trust lands. Nor do we feel free to ignore *Bogle Farms'* apparent rejection of a rule or doctrine that creates a presumption or necessary implication of intent to convey minerals that in effect overrides or diminishes the significance of surrounding circumstances that indicate an intent to include rock within the mineral reservation. We leave it up to our Supreme Court to consider whether *Bogle Farms'* clear rule requiring a determination of the intent of the parties to the original sale transaction can permit application of the surface destruction doctrine.

{46} Further, Plaintiff's and Amicus Curiae's concerns are subject to some degree of dilution in that Plaintiff has not pointed to any specific evidence showing a likely and substantial risk of future harm to purchasers of state trust lands based on surface destruction. Nor did Plaintiff show that she would be harmed based on destruction of the surface. We think it noteworthy that state law requires the Commissioner to obtain from lessees, such as Mainline, a bond to secure payment to the surface owner for damage to livestock range, water, crops, or tangible improvements that may occur as a result of the mineral lessee's activities. NMSA 1978, §§ 19-10-26 (1979), 19-10-27 (1925); *see Tidewater Associated Oil Co. v. Shipp*, 59 N.M. 37, 41, 278 P.2d 571, 574 (1954) (discussing the surface owner protection provisions of 1919 and 1925 laws and holding that a mineral lessee is similarly obligated to the surface lessee for damages to grass, livestock, or crops). It is also noteworthy that, in obtaining a zoning change for construction of its quarry, Mainline

---

[3] Private Grantor: *Downstate Stone*, 712 F.2d 1215; *W.S. Newell, Inc. v. Randall*, 373 So. 2d 1068 (Ala. 1979); *Harper v. Talladega Cnty.*, 185 So. 2d 388 (Ala. 1966); *Bambauer v. Menjoulet*, 29 Cal. Rptr. 874 (Ct. App. 1963); *Farrell v. Sayre*, 270 P.2d 190 (Colo. 1954) (en banc); *Kinney*, 128 P.3d 297; *Florman*, 207 S.W.3d 593; *Resler*, 139 N.W.2d 379; *Farm Credit Bank of Tex. v. Colley*, 849 S.W.2d 825 (Tex. App. 1993); *Atwood v. Rodman*, 355 S.W.2d 206 (Tex. Civ. App. 1962). United States as Grantor: *Hess*, 348 F.3d 1237; *Poverty Flats Land & Cattle Co. v. United States*, 788 F.2d 676 (10th Cir. 1986).

21

provided a reclamation plan in which it represented that, "[w]hen the quarry is completed[,] the land will be suitable for grazing and will form a basin for collecting storm water for livestock watering[.]"  The Rule 5 Mining Lease issued to Mainline states, "[l]essee has separately contracted with the owner of the surface estate of the lands described herein, which contractual arrangement . . . includes certain responsibilities relating to operations, reclamation, surface protection[,] and damages[.]"  And the district court made an unchallenged finding that "[a]fter removal of the rock that can be removed in a commercially viable manner, the site can be reclaimed in such a manner as to allow the pre-existing grazing use without substantial impairment."

**{47}**  We hold that the district court did not err in determining, under *Bogle Farms'* required analysis of the intent of the parties of the original sale transaction, that based on the sale transaction documentation, including the patent, and also based on all of the surrounding circumstances, the intent of the conveyance transaction was that the rock was included in the reservation of "all minerals of whatsoever kind" in the patent.

**CONCLUSION**

**{48}**  We affirm the district court's determination that the rock in question was a mineral within the mineral reservation in the 1947 patent relating to Section 16.

**{49}    IT IS SO ORDERED.**

 

**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

**CYNTHIA A. FRY, Judge**

**MICHAEL E. VIGIL, Judge (dissenting).**

**VIGIL, Judge (dissenting).**

**{50}**  The extent of the mineral reservation set forth in the transaction documents is ambiguous.[4]  Thus, the question before the district court was whether the original parties to

---

[4]The transaction documents consist of:  (1) Mr. Shelton's August 5, 1930 application to purchase Section 16 from the State; (2) the August 5, 1930 appraisal of Section 16; (3) the contract dated November 21, 1930, (which was signed on January 22, 1931) between Mr. Shelton and Land Commissioner James F. Hinkle setting forth the terms of the sale of Section 16 from the State to Mr. Shelton; and (4) the August 4, 1947 patent, signed by Land

the sale intended the surface and subsurface metamorphic rock in Section 16 to be included in the mineral reservation. The district court ruled, and the majority agrees, that the mineral reservation includes the rock. In my view, the district court erred in two respects: (1) it failed to take into consideration the surface destruction doctrine as bearing on the parties' intent at the time the contract for the purchase of Section 16 was made; and (2) it considered irrelevant evidence and without this evidence, its conclusion that the parties intended to include the rock in the mineral reservation is not supported by substantial evidence. Since the majority disagrees, I dissent.

## THE HOLDING OF *BOGLE FARMS*

{51} *Bogle Farms* overruled the holding in *Roe*[5] that because a purchase contract and patent did not specifically reserve sand and gravel in a mineral reservation, title to the sand and gravel passed to the purchaser along with the surface estate. *Bogle Farms*, 1996-NMSC-051, ¶ 34. *Bogle Farms* reiterated the principle laid down in *Burris*,[6] restated in *Rickelton*,[7] that in determining whether the general term "mineral" includes a specific substance is resolved on a case-by-case basis. *Bogle Farms*, 1996-NMSC-051, ¶ 21. "The case-by-case rule adopted in *Burris* is based on the principle that in contract cases the role of the court is to give effect to the intention of the contracting parties. The role of the court is to determine whether the parties intended to include [the substance] within the term 'mineral.'" *Bogle Farms*, 1996-NMSC-051, ¶ 22. A case-by-case analysis is required "because the intent of parties to one contract may not be the same as the intent of parties to another contract." *Id.* Given that "[t]he polestar of deed construction is the parties' intent," *id.* ¶ 34, *Bogle Farms* unambiguously mandates:

      [1.]    [A]nyone purchasing land under a purchase contract or a patent with a specific reservation would be bound by the terms of that reservation.

      [2.]    If there is not a specific reservation, the trial court must look to evidence outside the face of the contract to determine the meaning intended for the term "mineral" when that term has been shown under the circumstances to be ambiguous.

      [3.]    In those cases involving successors in interest to original purchasers, [where the purchase was not made in reliance on *Roe*], . . . the

---

Commissioner John E. Miles, conveying Section 16 to Mrs. Shelton.

[5]*Roe*, 103 N.M. at 521, 710 P.2d at 88.

[6]*Burris*, 88 N.M. at 147, 538 P.2d at 419.

[7]*Rickelton*, 91 N.M. at 481, 576 P.2d at 287.

issue is whether the parties to the original contract intended that the State reserve [the substance in question].

*Id.* ¶ 35.

**{52}**     In this case, none of the transaction documents contain a specific reservation of the surface and subsurface metamorphic rock in Section 16. Further, there is no dispute that the mineral reservation in the transaction documents is ambiguous. Thus, *Bogle Farms* required the district court to determine whether Mr. Shelton and Commissioner Hinkle, as the parties to the original contract, intended the State to reserve the surface and subsurface metamorphic rock in Section 16. With the foregoing principles and requirements in mind, I now turn to each specific disagreement I have with the majority.

## REJECTION OF THE SURFACE DESTRUCTION DOCTRINE

**{53}**     Mr. Shelton and Commissioner Hinkle, the parties to the original sale of Section 16, are deceased. Thus, the majority concludes, their intent "can be determined only objectively from the original sale-related documents and surrounding circumstances." Majority Opinion ¶ 35. The "surrounding circumstances" clearly include the condition of the land at the time of the sale. Since the original parties to the contract are deceased, and the transaction documents are ambiguous, the evidence most probative of their intent is the condition of the land at the time of the sale.

**{54}**     The surface destruction doctrine requires the fact finder to engage in a critical analysis of the land at the time of the sale. I refer to the surface destruction doctrine to mean, as quoted by the majority in Paragraph 25, a doctrine "which holds that, in the absence of clear contrary intent, where materials alleged to be 'minerals' are plainly visible on the surface, and where the surface would have to be destroyed in order to 'mine' them, the parties could not have intended those materials to be 'minerals' because, if they were, the mineral reservation would swallow up the grant and render it worthless." Plaintiff asked the district court to use the doctrine in assessing the intent of the parties, but the district court refused. The majority concludes this was not error, Majority Opinion ¶ 44, and I disagree.

**{55}**     This area of New Mexico is part of what is called the Rocky Mountains for very good obvious reason. The district court briefly noted the land's physical condition in its findings, noting that prior to 1930, Section 16 was owned in fee by the State, and that "Section 16 is located in that part of Torrance County known as 'Perdenal Hills' and is *largely composed of Pre-Cambrian metamorphic rock*." (Emphasis added.) This finding is supported by photographs showing rocks on the surface all over Section 16. To illustrate, two photographs introduced into evidence are attached to this dissent. The majority also notes that Plaintiff showed that the rock is part of a fifteen- to twenty-mile-wide geologic formation with rock outcrops that stretches from the Sangre de Cristo Mountains on the north into Texas and Mexico on the south. Majority Opinion ¶ 28. The district court findings and Plaintiff's evidence establish that the rocks in Section 16 were ubiquitous and

24

obvious in 1930. Nevertheless, the district court made a finding that "[t]he fact that surface rock was visible on Section 16 was not the same as a determination that such rock was or was not a mineral under the 1930 Shelton contract to purchase or under Patent No. 1906's mineral reservation."

{56}    The majority has discussed the appraisal as if the appraiser was representing Mr. Shelton. Majority Opinion ¶ 6. The evidence suggests otherwise. In the application to purchase Section 16, Mr. Shelton recites the amount he offers to pay for the land and he also agrees to pay an *additional* amount of money "to defray the expense of appraisement and advertising as per the rules of the State Land Office, such amount to be returned to me in the event I am not the successful bidder." The appraisal is based on the personal knowledge of the appraiser and he does not classify the rock as a mineral, notwithstanding its obvious and abundant presence on Section 16. In the 1930 contract to buy Section 16, Mr. Shelton agreed to pay the agreed upon price for the land and he also paid an additional amount, "the same being the payments required for the advertisement and appraisement of said land[.]" Thus, these documents suggest on their face that the State hired the appraiser, and Mr. Shelton simply reimbursed the State for the expense of the appraisal. It is therefore a fair inference that the appraiser represented to his principal, the State, that notwithstanding the presence and abundance of the rocks, there were no minerals on Section 16.

{57}    The majority's reasons for refusing to adopt the surface destruction doctrine to facilitate the intent inquiry mandated by *Bogle Farms* are unconvincing. Majority Opinion ¶¶ 44-46. The majority states that Plaintiff urges its adoption as a means of conveying minerals by implication or by presumption in violation of *Bogle Farms*. Majority Opinion ¶¶ 19, 44. I disagree. *Bogle Farms* did not consider the surface destruction doctrine, and the statement in *Bogle Farms*, 1996-NMSC-051, ¶ 34, that state trust lands should not be conveyed by implication is not a rejection of the surface destruction doctrine. Rather, the statement sets forth an additional reason for overruling *Roe*'s conclusion that if a substance is not specifically *included* in a mineral reservation, it is *excluded* from the mineral reservation. Instead, the actual intent of the parties governs, and the *Bogle Farms* statement does not preclude utilizing an evidentiary aid such as the surface destruction doctrine to construe the intent of the original parties to the transaction. In addition, the majority in wholesale fashion rejects the significant and substantial body of cases which recognize and apply the surface destruction doctrine on the basis that "they involve purely private land transactions or conveyances by the United States of lands dissimilar to New Mexico's trust lands." Majority Opinion ¶ 44. Noticeably absent in the wholesale rejection of these cases is any indication that the doctrine is not a valuable and valid aid in construing intent.

{58}    I would adopt the surface destruction doctrine as an evidentiary tool to facilitate the intent inquiry required by *Bogle Farms*. The intent of the original parties is to be construed from the perspective of the interest the buyer desires to purchase, and the interest the seller desires to sell. Mr. Shelton's application to purchase Section 16 states he intends to use Section 16 to "graze sheep or raise cattle"; the appraisal states that Section 16 is best adapted for "grazing"; and the contract, which is the only document signed by both Mr. Shelton and

Commissioner Hinkle, states that Section 16 "is being purchased for the purpose of grazing and agriculture only[.]"  Thus, I would remand this case to the district court to utilize the surface destruction doctrine to determine whether removal of the surface and subsurface metamorphic rock unreasonably interferes with what use the original parties intended for Section 16, namely for grazing and agricultural purposes.  If such a burden results, this is persuasive evidence that Mr. Shelton and Commissioner Hinkle did not intend the State to reserve the rock in the general mineral reservation.

**CONSIDERATION OF IRRELEVANT EVIDENCE**

**{59}**     The district court findings of fact relating to whether Mr. Shelton and Commissioner Hinkle intended to include the rock in the general mineral reservation are, for the most part, all facts which occurred after 1930.  Many of them are set forth verbatim in the majority opinion in Paragraphs 22-24.  Without these facts, there is no basis for concluding that Mr. Shelton and Commissioner Hinkle intended to include the rock in the general mineral reservation.  For the following reasons, I submit that the district court erred in considering these facts.  Furthermore, they do not support the district court's findings of intent, because they are irrelevant.

**{60}**     Commissioner Hinkle agreed to sell Section 16 to Mr. Shelton, and they entered into a contract, dated November 21, 1930.  Under the contract, Commissioner Hinkle agreed to convey a fee simple interest in Section 16 to Mr. Shelton upon payment of the purchase price in full subject to the following reservations and conditions:

> [T]hat this land is being purchased for the purpose of grazing and agriculture only; that while the land herein contracted for is believed to be essentially non-mineral land, should mineral be discovered therein it is expressly understood and agreed that this contract is based upon the express condition that the minerals therein shall be and are reserved to the fund or institution to which the land belongs, together with right of way to the Commissioner, or any one acting under his authority, at any and all times to enter upon said land and mine and remove the minerals therefrom without let or hindrance.

The land was paid for, and on behalf of the State, Commissioner Miles issued a patent to Mr. Shelton's widow on August 19, 1947.  The patent conveys a fee simple estate to Section 16, but reserves to the State:

> all minerals of whatsoever kind, including oil and gas, in the lands so granted, and to it, or persons authorized by it, the right to prospect for, mine, produce and remove the same, and perform any and all acts necessary in connection therewith, upon compliance with the conditions and subject to the limitations of the laws of the State of New Mexico[.]

26

**{61}** As set forth in this dissent, there are two general mineral reservations in this case: the mineral reservation in the 1930 contract between Commissioner Hinkle and Mr. Shelton, and the mineral reservation in the 1947 patent issued to Mr. Shelton's widow by Commissioner Miles. As quoted above, the 1930 contract first states that the land contracted for "is believed to be essentially non-mineral." With this preface, the contract then provides, "should mineral be discovered" on Section 16, such minerals "are reserved." On the other hand, the 1947 patent in the broadest language states that "all minerals of whatsoever kind" are reserved. The documents are not only separated by almost seventeen years, they are signed by different commissioners. The differences between the two reservation clauses are material, and the majority does not determine which mineral reservation applies. I conclude, however, that the 1930 general mineral reservation is the one which is applicable.

**{62}** The contract between the parties defines what the purchaser (Mr. Shelton) agreed to buy and what the seller (the State) agreed to sell. The function of the patent is to convey the legal title which the parties agreed upon, not to change the contract made by the parties. *See Bogle Farms*, 1996-NMSC-051, ¶ 4 (noting that purchasers buying land from the Commissioner of Public Lands under installment contracts received patents from the Commissioner transferring legal title after fulfilling their contractual payment obligations); *Jensen v. State Highway Comm'n*, 97 N.M. 630, 631, 642 P.2d 1089, 1090 (1982) (stating that the provisions of the purchase contract determine whether a substance is reserved to the State, and if the State desires to reserve a substance, "it may do so by specific reservations in the purchase contract"); *cf. Deaton v. Gutierrez*, 2004-NMCA-043, ¶ 14, 135 N.M. 423, 89 P.3d 672 (stating that until the Bureau of Land Management issued a patent to the land, title remained in the United States). *Bogle Farms* itself was a declaratory judgment brought by original purchasers and successors in interest to land sold by the Commissioner of Public Lands under installment contracts. 1996-NMSC-051, ¶ 3. The plaintiffs alleged that the general mineral reservation of their purchase contracts did not include sand and gravel, and they sought a declaratory judgment that their patents could not include a specific reservation of sand and gravel. *Id.* ¶ 5.

**{63}** I therefore conclude that the applicable mineral reservation at issue in this case is the one contained in the 1930 contract between Commissioner Hinkle and Mr. Shelton. The district court failed to relate the post-1930 findings of fact back to the intent Mr. Shelton and Commissioner Hinkle had when they signed the 1930 contract. Thus, Finding of Fact No. 69 is not supported by substantial evidence. This finding, which the majority refers to in Paragraph 37, and relies on in Paragraphs 38-39 in affirming the judgment states:

> Based on the parties' language in their dealings with one another, their conduct, the objectives they sought to accomplish, and the surrounding circumstance the parties intended that the crushed stone, an industrial mineral, was to be considered a mineral in the 1930 Shelton contract to purchase and one of those "minerals of whatsoever kind" included in the State's mineral reservation in Patent No. 1906.

Further, assuming the district court could, consistent with *Bogle Farms*, determine the most reasonable meaning of the general mineral reservation if Mr. Shelton and Commissioner Hinkle had different meanings in mind, Finding of Fact No. 72 fails for the same reason. Finding of Fact No. 72 states:

> Even if the parties disagreed as to the meaning of the term "mineral" in the 1930 Shelton contract to purchase or the phrase "minerals of whatsoever kind' in the 1947 patent, or if the parties" intentions could not be determined, it is most reasonable that the term and phrase include the industrial mineral known as crushed stone, based on all surrounding circumstances.

**{64}** The majority asserts that it does not rely on any findings made by the district court after the patent was issued in 1947, and then it fails to specifically identify what those findings are. Majority Opinion ¶¶ 36-37. I submit that the applicable date for determining intent is as of the 1930 contract and not the 1947 patent.

**{65}** When one considers only those findings which are contemporary with, or precede 1930, they do not support a finding that Mr. Shelton and Commissioner Hinkle intended to include the rock in the general mineral reservation. For this additional reason, I dissent.

**CONCLUSION**

**{66}** I would reverse and remand to the district court to consider the surface destruction doctrine as evidence of the parties' intent, and not to consider the post-1930 evidence unless it is shown to be indicative of the parties' intent in signing the purchase contract in 1930. Since the majority disagrees, I dissent.

_____

**MICHAEL E. VIGIL, Judge**

**Topic Index for *Prather v. Lyons*, No. 29,812**

**AL**          **ADMINISTRATIVE LAW AND PROCEDURE**
AL-SE        Sufficiency of Evidence

**AE**          **APPEAL AND ERROR**
AE-AJ        Appellate Jurisdiction
AE-HE        Harmless Error
AE-PA        Preservation of Issues for Appeal
AE-SR        Standard of Review
AE-SB        Substantial or Sufficient Evidence

**CN**          **CONTRACTS**
CN-AM       Ambiguous Contracts

| | |
|---|---|
| CN-IT | Intent |
| CN-RE | Real Estate Contract |
| | |
| **EV** | **EVIDENCE** |
| EV-RC | Relevancy, Materiality, and Competency |
| | |
| **GV** | **GOVERNMENT** |
| GV-EN | Environmental Law |
| GV-LU | Land Use |
| GV-PL | Public Lands |
| | |
| **NR** | **NATURAL RESOURCES** |
| NR-MM | Mines and Minerals |
| NR-RO | Royalties |
| | |
| **PR** | **PROPERTY** |
| PR-AP | Appraisal |
| PR-MD | Mineral Deed |
| PR-MR | Mineral Resources |
| PR-PU | Public Lands |
| PR-QT | Quiet Title |
| PR-RE | Real Estate Contract |
| PR-SD | Surface Destruction Doctrine |



PLAINTIFF'S
EXHIBIT
15A
3-23-09
0722-CU-2006-228

SLO 0380



PLAINTIFF'S
EXHIBIT
16 B
D-0712-CV-2006-222
03-23-09

MAINLINE ROCK AND BALLAST, INC.
## TORRANCE QUARRY SITE
SW ¼ SEC. 16, Twp. 12 N, Rng. 12 E, NMPM